IDA WHITTEN CALLAWAY, and MAXINE WHITTEN and WILROSE WHITTEN, Minors, by their Guardian and Curator, J. E. FISHER v. HORACE F. BLANKENBAKER and GUY BLANKENBAKER, Individually and as Executors of the Will of NELL BLANKENBAKER, Appellants, MARIUM SHARP ET AL., Defendants.—141 S. W. (2d) 810.

Division One, June 28, 1940.

384

*R. M. Bagby, Walker Pierce* and *A. W. Walker* for appellants.

*Luman Spry* and *Robert D. Johnson* for respondents.

BRADLEY, C.—This cause contests the will of Nell Blankenbaker, deceased. Plaintiffs are the niece and grandnieces, respectively, of testatrix. Appellants, Horace F. and Guy Blankenbaker, are brothers of testatrix and devisees and executors under the contested will. It is sufficient to say that other parties defendant are interested in the will. The jury found against the alleged will, and Horace F. and Guy Blankenbaker appealed.

The grounds of contest were mental incapacity, undue influence, and that the will was not properly witnessed.

It is contended that the evidence was not sufficient to justify submission to the jury. Error is also assigned on the instructions and on argument of counsel.

At the time of the execution of the will, April 29, 1935, testatrix was 71 years old. She died, single, in January, 1937, leaving only collateral kin. Her estate, consisting mostly of real estate in Howard County, was of the value of about $41,000. The two brothers, Horace and Guy, and the bodily heirs of a deceased brother and a deceased sister, were the principal beneficiaries. The devises and bequests to Horace were estimated to be worth about $16,000, to Guy about $12,000, and to the bodily heirs of the deceased brother about $7800, and to the bodily heirs of the deceased sister about $4600. The bequests to plaintiffs, the daughter and granddaughters of a deceased sister, were worth about $900.

Testatrix, for the greater part of her life, resided in New Franklin, and until 1929, the year in which her sister, Ada, died, she and Ada lived in their home in New Franklin. Her brothers, Horace and Guy, resided in the country, a few miles from New Franklin. After the death of Ada, testatrix continued to occupy the home in New Franklin until August 15, 1934, when she went to live with Horace, whose wife died in 1933. The will was prepared by L. A. Kingsbury, an insurance man, and a cousin of testatrix. She had executed three prior wills (1920, 1933, and in December, 1934), all prepared by Kingsbury. He testified that testatrix sent him a note directing him to make a change in her will; that the change was minor, and pertained to a bequest to a church; that he then had the 1934 will in his possession, and that he "fixed the will as she wanted it," went out to see her, read it to her; that he suggested Mrs. Carver (see infra) as one of the witnesses and that testatrix told him to call Mrs Carver; that he did so; and that testatrix signed the will in his and Mrs. Carver's presence, and that he and Mrs. Carver signed as witnesses in the presence of testatrix, and that he destroyed (he thinks) the 1934 will in testator's room after the will here involved was executed. Of the prior wills only the 1920 will could

be found, and it gave to Ida Whitten Callaway, plaintiff here, $100, and to Frank Whitten, who died in 1926, and who was the father of plaintiffs, Maxine and Wilrose, $100.

Did contestants make a submissible case on the issue of mental incapacity? For some time, period not definite, prior to the execution of the will, testatrix suffered from arterio sclerosis, high blood pressure, and heart trouble. January 5, 1935, she had a fainting spell, contestants say a stroke of apoplexy, cerebral hemorrhage, but the record is not definite on this. In 4 or 5 days after the supposed stroke, and for a period of about 10 or 12 days, testatrix, at intervals, had hallucinations as to where she was and as to what was going on about her.

Jesse B. Hopper testified that he lived in New Franklin from 1923 to 1931; that he "was councilman for two terms;" that he knew testatrix; "talked to her two or three times" while he was councilman; that he was "at Horace Blankenbaker's home the last of March or the first of April, 1935, to see Mr. Blankenbaker, and Miss Nell came to the door and I talked to her and asked her where Mr. Blankenbaker was and she said she didn't know, and I asked her when she thought he would be back and she said she had no idea, and I asked her if she knew me and she said she didn't, and I told her she ought to have known me because I was councilman at New Franklin, and had talked to her there, and she said she didn't know who I was at all." Hopper further testified that he talked with testatrix on the occasion mentioned for 5 minutes, and that in his "opinion her mind wasn't sound at that time," but he does not say what they talked about except as above, and that he told her that he wanted to see "Mr. Blankenbaker and I asked her to call me and she never did do it; or have Mr. Blankenbaker call me, and he didn't call me."

Clifton Adams testified that he was a maternal uncle of contestants, Maxine and Wilrose, knew testatrix, kept his horse at her barn for four years while he went to high school; that in 1936, he held a government position, "worked on the soil conservation;" went out to the Horace Blankenbaker farm in the latter part of December, 1936, saw testatrix, shook hands with her and she said, "I don't believe I know you, and I said, 'You know Clifton Adams, I have known you all my life;'" told her he had come "to check up on the farm," and that she said "I haven't sold this farm" (testatrix owned half interest in farm where Horace lived); that he was not able to make her understand who he was; that in his opinion her mind was then unsound.

Dr. T. C. Richards testified that he had practiced medicine and surgery for 46 years; that apoplexy is a cerebral hemorrhage; that there was no cure for high blood pressure coming from arterio sclerosis. The facts as to the illness of the testatrix, the stroke, the hallucinations, her age, and the Hopper incident were presented

to Dr. Richards in a hypothetical question and he gave it as his opinion that testatrix was of unsound mind on April 29, 1935, when the will was executed. On cross-examination Dr. Richards testified: "Q. Then it is your opinion that every man seventy years of age who has had a stroke of apoplexy is thereafter doomed mentally? A. I said they have an unsound mind."

On the issue of mental incapacity, the evidence of proponents of the will follows. Dr. G. L. Chamberlain, who was called during the absence of Dr. Fleet, the family physician, testified that he knew testatrix for 15 years, saw her professionally December 23, 1934, January 5th, 17th, 26th, and February 1st and 16th, 1935, examined her and treated her; that she had high blood pressure, arterio sclerosis, and "might have had some symptoms referable to her heart;" that she did not have any symptoms of paralysis, and did not have a cerebral hemorrhage, apoplexy; that if she had a fainting spell on January 5, 1935, it could have come from an upset stomach or high blood pressure; that her mind, on all occasions he saw her, was sound. Dr. Chamberlain saw testatrix in January, 1937, in her last illness and said that her mind was then sound; that she was sick about a week and died of pneumonia. On cross-examination he said that he did not recall whether Horace told him about the fainting spell that testatrix had on January 5, and that Horace did not tell him about the hallucinations, and that he did not recall that any one, at the time, told him. It appeared from a deposition of Dr. Chamberlain (referred to for impeachment purposes) that he was interrogated about a *stroke* and *cerebral hemorrhage*. As appeared in the deposition he was asked and answered as follows: "Q. In connection with Miss Nell's condition would you say that the arteries had hardened, or just what would you say about the trouble she had? A. She probably had the common one, a hemorrhage, but she probably had that when she had the stroke. Q. When the blood vessels had hardened? A. Yes." And in the cross-examination (in the deposition) this appears: ". . . Cerebral hemorrhage and apoplexy have nothing to do with the mental condition of the patient. I have seen people have strokes and have a good mind afterward maybe 25 years."

Dr. J. B. Fleet testified that he had known testatrix for 40 years, saw her professionally on April 12th, 20th, and 26th, 1935; that she had influenza and suffered from myocarditis. "Q. Now doctor, from your examinations and observations of Miss Blankenbaker, please state fully what her mental condition was about the 29th of April, 1935. A. Normal. Q. Was she of sound or unsound mind? A. Sound."

Dr. H. S. Moser, a dentist, testified that he knew testatrix for 37 years, saw her in August, 1935, had a conversation with her, "talked about teeth mostly;" that he did some dental work for her in the

early part of January, 1937; that her mental condition "was all right any time I ever met her; I never had any reason to believe otherwise."

Mrs. Alma Carver, a practical nurse and a witness to the will, testified that she had known testatrix several years, and was employed by her from March until August, 1935; took care of her and did some housework; that her condition improved; that she was confined to her room upstairs during March and April, 1935, sat up some, was sitting up in bed when the will was signed; that she moved down stairs in May, and "was up and about the house" during the summer. Mrs. Carver further testified that she was with testatrix practically all the time, slept in her room; that testatrix paid her by check; that her mind was sound.

Virginia Ritchey testified that she knew testatrix, but not until the fall of 1934; that she did housework in Horace's home for about three years prior to June, 1936; that testatrix had a spell in January, 1935; that her (testatrix's) room was upstairs; that she had gotten up in the morning and had started to dress, and she was over by the drum and a low chair was sitting there and she was stricken and got to her knees before I got up there, and when I got up there I found her on her knees at this chair. . . . We (witness and Horace) got her up and started to bring her down stairs and just as we started down the steps she kinda slumped and we put her to bed upstairs and then I went to the kitchen to get cold water." Virginia further testified that testatrix was pretty sick for 10 or 15 days, and was irrational at times, but that the irrational periods were short. She also testified that, in her opinion, the mind of testatrix at the time the will was executed "was as sound as any one." Also, she testified that she had known witness Hopper for several years, and that it was she, and not testatrix, who talked to Hopper when he was at Horace's farm.

We do not deem it necesary to further detail the evidence of individual witnesses. It is, we think, sufficient to say that eight other lay witnesses, who had known testatrix for varying periods, saw and talked with her on occasions during the spring and summer of 1935, two on Easter Sunday, April 21, 1935. The evidence of all these was to the effect that on the occasions they saw testatrix her mind was sound.

 A will contest is an action at law and the weight of the evidence and credibility of the witnesses are questions for the jury, and the most favorable evidence rule, when the sufficiency of the evidence is challenged, applies in a will contest the same as in any other law case. [Townsend et al. v. Boatmen's National Bank et al., 340 Mo. 550, 104 S. W. (2d) 657, l. c. 665, and cases there cited. See also Proffer v. Proffer et al., 342 Mo. 184, 114 S. W. (2d) 1035, l. c. 1040, and cases there cited.]  Giving contestants the benefit of the most favorable evidence rule, it was established that testatrix was 71 years old when she executed the will; that she had arterio sclerosis,

390

high blood pressure and heart trouble; that she had a fainting spell January 5, 1935, prior to the execution of the will on April 29, thereafter; that in a few days after the fainting spell she had hallucinations, for brief periods( how frequent is not shown) as to where she was and as to what was going on about her; and that the hallucinations continued for a period of 10 or 12 days. On certain assumed hypotheses, Dr. Richards gave it as his opinion that testatrix was of unsound mind at the time of the execution of the will. It was assumed that testatrix had a cerebral hemorrhage, a stroke of apoplexy, but, as stated, the evidence is not definite that she had such stroke. Also included in the question was the circumstance related by the witness Hopper. He had no long acquaintance with testatrix; had talked with her only 2 or 3 times, and that was, the inference is, while he was councilman in New Franklin, sometime between 1923 and 1931. Also, it will be noted that Virginia Ritchey testified that it was she and not testatrix who talked to Hopper. If it were Hopper's sanity concerned instead of testatrix's, then, according to the argument, Virginia Ritchey's evidence would tend to show that his mind was unsound when he was talking to her, and this because, he did not recognize her, although she, as stated, had known him for several years.

The Clifton Adams incident was in the latter part of December, 1936, and, under the record here, too remote to be a substantial circumstance.

Although it is repetition, we here again set out the question asked Dr. Richards and his answer, as appears, supra. ''Q. Then it is your opinion that every man seventy years of age who has had a stroke of apoplexy is thereafter doomed mentally? A. I said they have an unsound mind.'' The most favorable effect of the evidence of Dr. Richards is that the mind of testatrix, after the apoplectic stroke (assuming such to be true), was *unsound*. He does not say to what extent. An *unsound* mind, irrespective of extent, is not sufficient to render one incapable of executing a valid will. Sayre et al. v. Trustees of Princeton University et al., 192 Mo. 95, 90 S. W. 787, was a will contest. Mental incapacity was an issue. In that case this language was used [192 Mo. l. c. 128, 90 S. W. 787]:

''Medical men of great learning maintain that a mind diseased on one subject must be classed as unsound, but the law of this State is too well settled to be gainsaid that a man's mind may be impaired in one faculty and practically unimpaired in all others. Derangement of mental faculties does not incapacitate one under our laws from making a will, if it does not render him unable to transact his ordinary business, and incapable of understanding the extent of his property and of appreciating the natural objects of his bounty.'' [See also Nute v. Frye et al., 341 Mo. 1138, 111 S. W. (2d) 84, l. c. 87.]

'' 'A testator with mind enough to understand,' the ordinary affairs of life, the kind and extent of his property, who are the natural

objects of his bounty, and that he is giving his property to the persons mentioned in his will, in the manner therein stated, is capable of making a will under the law of this State.'' [Rex et al. v. Masonic Home of Missouri et al., 341 Mo. 589, 108 S. W. (2d) 72, l. c. 84; Sanford v. Holland, 276 Mo. 457, 207 S. W. 818, l. c. 820; Hahn v. Hammerstein, 272 Mo. 248, 198 S. W. 833, l. c. 836.]

Smarr et al. v. Smarr et al., 319 Mo. 1153, 6 S. W. (2d) 860, was a will contest and mental incapacity was an issue. It appears (319 S. W. 1153, 6 S. W. (2d) l. c. 864) that the ''testator was irritated by the use of disinfectants in the family laundry, made necessary by the presence of clothing from his son William, who lay ill in his home, and objected to the servant's charge of $2.50 for assisting in the washing. When a neighbor came in to assist his wife who suffered burns, in 1919, from which she finally died, he insisted on showing her the scorched base board in the room where the fire occurred. On a subsequent Sunday morning he scraped off this charred portion. When this neighbor came over the morning after his wife died, he said to her, 'We had bad luck last night, we lost Sally.' Afterwards he seemed to enjoy playing with children, though he had never done so before; started to change the garden fence and did not finish it; put several inches of clay on a flower bed; cut down the hollyhocks because he said they were growing too high; gave some old safety razor blades to neighbors as keepsakes; claimed that his daughter-in-law had not paid him for a chair and refused to let her keep some articles she said he gave her; forgot that a neighbor had returned a chicken; refused to let one of his wife's relatives have her dress bonnet. Sometimes he would talk with neighbors he had known all his life and other times he would not speak to or notice them, and would sit still for hours in a rocking chair; got lost in Warrensburg one night in December, 1920, in going to home of his brother-in-law; asked name of persons over and over again; repeated in his conversations; was restless and childish and could not remember things he had recently said; promised to lend a man some money and apparently forgot the promise; said a chair broke down with him when there was nothing the matter with the chair; fell over in a chair in the yard and said the chair fell in a hole, although there was no hole; and during his last sickness he said they had him in a sheep pen. These and like eccentricities and generalities scattered over a long period apparently form the basis of the opinions and conclusions given. They are not facts so connected, consistent, strong, and bearing upon the issue of testator's mental condition at the time he executed the will, as to lend the opinions and conclusions any persuasiveness, cogency, or weight.''

The Rex case, supra, contested the will of Mary Huthmaker. Mental incapacity was relied on. The jury found against the will. On appeal we held that there was no substantial evidence to make an issue

on mental incapacity. The testatrix was 80 years old when the will was executed, and 81 when she died. The evidence on the part of contestants on the question of mental incapacity was about as follows: Testatrix had spells of temper and would fly into a rage without cause. She picked up dead twigs and small sticks fallen from trees on the lawn. On an occasion she ate her dinner, and then said she had not had dinner. She "had no religion; claimed that she had been locked in the bathroom; thought she was eating carrots, when she was eating potato dumplings." She was "an awful curious woman;" asked the maid if she would take anything in her room. She would hide her pocketbook and change the hiding place, and "one time while she was eating a meal, went to the closet, took out her pocket book and opened it;" took a piece of decoration from a Christmas tree, threw it on the floor and stepped on it; talked to herself; cut farm advertisements from magazines and said she could buy land, sell it, make money, and that she could have her money and bonds buried with her and nobody would get it; cut some pictures of bathing beauties from magazines, showed these pictures, "and then lifted her dress, partly exposing her leg, and said 'that is a shapely leg.' " She claimed that she had prepared herself some extra breakfast, when she had not. She would start talking on one subject, and suddenly change to another; claimed there was a rat in a barrel when there was not; asked a person if he did not think that the corpse of her dead sister (6 years younger) "looked like a sixteen year old girl," and said to another person that the dead sister was her daughter. She was stingy about the number of lights burned; often discussed religion; didn't believe in God; got mad because a tractor went across her land without permission and demanded $10 and got it. She would buy enough to supply the table, but was close as to the amount cooked; hung some food in the cistern and let it spoil. She wore a man's coat, hat and shoes. She claimed that her sister-in-law had been in her (testatrix's) home "the day before," when she had not. She hammered with a piece of board against the windowsill at night. She went in the house and locked the door when a man who was working for her approached. She claimed that her sister when sick was "putting on;" would insist on the sick sister eating when she had just finished her meal. She "would pound Mina (the sister who died) on the back with her fists.

It is not necessary to review other cases. Clearly contestants in the present case did not make a submissible case on the issue of mental incapacity.

■ Was there substantial evidence of undue influence? Undue influence is alleged on the part of both brothers, Horace and Guy. In the brief contestants make reference to what is termed "evidence of undue influence," as follows: (1) That the will was executed at Horace's home and while testatrix was in bed; (2) that she owned a

large acreage of farm lands and that Horace and Guy looked after her lands for her, and that after she moved to Horace's, he continued to look after part of her lands as he had done since 1907; (3) that Horace and testatrix transacted business at the same bank; (4) that testatrix kept some of her papers in Horace's private bank box; (5) that Horace occupied a part of her lands and instead of paying "a stipulated sum" he "gave her a share in the earnings;" (6) that at the time of her death she had "a nice little sum" on deposit and that a check on her account cleared on January 7, 1937 (presumably after death), and (7) that none of her checks could be found after her death, although her banker, after her death, mailed her checks to Horace's address. Also, the circumstance that Guy did not testify is referred to.

The record shows that Maxine and Wilrose Whitten, the grand-nieces, were 19 and 17 years of age at time of trial; that their father, nephew of testatrix, died in 1926, as above stated, and that testatrix had manifested interest in these girls, and contemplated having them stay with her (school year 1934-1935) and go to school, but this plan was abandoned when she, herself, decided to go to Horace's. Horace testified that shortly before she went to his home, as we understand the record, testatrix, at his home, was talking to him about some one staying with her, and that he said, "Nell, if you wish to, if you would rather come out here and stay with me there is plenty of room in this big house, and if you would rather do it you come on out here and bring what you need—we would be glad to have you," and that testatrix said that she had talked to one of the Whitten children about staying with her, but that if she could "get off" she would rather come to his house; that she did not want "to stay in town any longer;" that later testatrix told him that she "had a talk with . . . some of them . . . and they said it would be all right," and with that consent testatrix "came out to my place."

It is not necessary that undue influence be proven by direct evidence. It may be shown by or inferred from the facts and circumstances in evidence. But such facts and circumstances must, from their nature, at least, savor of some act which by reasonable construction may be held to indicate a purpose on the part of the proponents to gain some pecuniary advantage. Undue influence must not rest on mere opportunity to influence, or on mere suspicion. There must be evidence of undue influence, either in fact or presumptively. It must not be merely the influence of natural affection. To be undue influence it must arise to the mark of such overpersuasion, coercion, force or deception as breaks the will power of the person overinfluenced and puts in its stead the will of another. [Fessler et al. v. Fessler et al., 332 Mo. 655, 60 S. W. (2d) 17, l. c. 23, and cases there cited.] The law of undue influence, as here stated, is almost a perfect quote from the law as collected in the Fessler case.

That there is nothing in the present case to make a submissible issue on undue influence is plain; at most, there is only a suspicion. Absent mental incapacity, testatrix had the right to make such a will as she chose, and neither court nor jury has the right to overturn that will simply because they may think she did not do justice to her "family connection." [Berberet v. Berberet et al., 131 Mo. 399, l. c. 411, 33 S. W. 61.]

It is alleged that Mrs. Carver did not *see* testatrix sign the will and did not see Kingsbury sign as a witness. Therefore, it is contended that the will was not properly executed and is void. Mrs. Carver testified that she was down in the kitchen; that Kingsbury came down and told me "she (testatrix) had some papers he wanted me to sign;" that she went up "into Miss Nell Blankenbaker's room" and "signed this paper (the will);" that at the time she signed, she (the witness), the testatrix, and Kingsbury were all in the room together. "Q. I will ask you if while you were in the room with Miss Nell Blankenbaker and Mr. Kingsbury, if Mr. Kingsbury didn't say to you in the presence of Miss Nell Blankenbaker that Miss Nell Blankenbaker wanted you to witness the will? A. He did." On cross-examination Mrs. Carver said that she did not see testatrix sign the will; that Kingsbury read to her the witnessing clause before she (Mrs. Carver) signed.

In an affidavit (introduced by contestants) made pursuant to Sec. 532, R. S. 1929, Mo. Stat. Ann., p. 324, Mrs. Carver stated: "After I signed as subscribing witness and after L. A. Kingsbury had left our presence, she (testatrix) did tell me that the paper I had signed was her last will and testatment." But Mrs. Carver knew that the document she signed as a witness, purported to be the will of testatrix before being so told, and this because Kingsbury had read to her the witnessing clause, which recited that "the foregoing statement" was the last will and testament of Nell Blankenbaker. It is not necessary that the witnesses to a will know its contents. [Ortt v. Leonhardt, 102 Mo. App. 38, 74 S. W. 423. See also 27 University of Missouri Bar Bulletin, 64.]

"Every will shall be in writing, signed by the testator, or by some person, by his direction, in his presence; and shall be attested by two or more competent witnesses subscribing their names to the will in the presence of the testator." [Sec. 519, R. S. 1929, Mo. Stat. Ann., p. 312.] Although attesting clauses frequently recite that the will was signed by the testator in the presence of the witnesses and that the witnesses signed in the presence of each other, etc., there is nothing in the statute that so requires, and such is not necessary. [Grimm et al. v. Tittman et al., 113 Mo. 56, 20 S. W. 664; Schierbaum et al. v. Schemme et al., 157 Mo. 1, 57 S. W. 526.] The statute does require, however, that the witnesses sign in the *presence* of the testator, but we know of no authority that says that

the testator must actually *see* the witnesses sign in order to comply with that part of the statute which says that the witnesses shall sign "in the presence of the testator." There is no claim that Kingsbury did not properly witness the will, and, under the facts, it would, indeed, be hypertechnical to say that Mrs. Carver did not sign as a witness in the presence of testatrix.

It is not necessary to consider other assignments. The judgment should be reversed and the cause remanded with direction that a judgment be entered that the contested will is the last will of testatrix. It is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.