CORA M. WALTER, EMMA WILLIAMS and ANNA A. BRAND, Appellants, v. KATHERINE ALT, JOSEPHINE M. ALT, LYDIA A. RUETNER, KATHERINE ALT and JOSEPHINE M. ALT, Trustees under the Will of JOHN ALT, and KATHERINE ALT and JOSEPHINE M. ALT, Executrices under the Will of JOHN ALT.—152 S. W. (2d) 135.

Division One, June 12, 1941.

54

*Neuhoff & Millar* for appellants.

56

*E. McDonald Stevens* and *Walter Wehrle* for respondents.

58

DALTON, C.—Action to contest the will of John Alt, deceased, on the ground of testamentary incapacity and undue influence. At the close of all the evidence the court directed a verdict sustaining the will. Judgment was entered on the verdict and contestants have appealed.

Error is assigned upon the exclusion of evidence and upon the court's failure to submit the cause to the jury. A statement of facts is necessary and a fair statement required an extended one.

 Testator died December 21, 1937, at the age of 91 years. His wife had died March 7, 1933. He was survived by six daughters, Emma, Katherine, Josephine, Anna, Lydia and Cora. Three are contestants and three proponents. For 31 years testator resided on Bemiston Avenue in Clayton, but on November 11, 1937, he moved out on Conway Road, St. Louis County. For 28 years, until 1934, he was employed by the City of Clayton as street commissioner, assistant street commissioner and park commissioner.

The will was executed July 17, 1937, thirteen days after testator's 91st birthday. Testator failed rapidly the last six months of his life, became bedfast in September and died in December, 1937, of the infirmities of old age.

The will devised the Conway Road residence in trust for his unmarried daughters for life and, upon the death or marriage of the last survivor, to his then living descendants, *per stirpes*. Katherine and Josephine were each bequeathed $1,000 and the residue to the six daughters, each to be charged with all loans, advancements and interest. Katherine and Josephine were named as trustees of the trust property and as executrices.

Testator had executed prior wills in 1927, 1931, and 1933, with codicils to the 1933 will in 1935 and 1936. All except the will of 1931 were filed with the probate court, but not admitted to probate. Each of these wills contained a devise of the Bemiston Avenue property in trust for his unmarried daughters. The trust for his unmarried daughters was his wife's idea. Each of these wills bequeaths $1,000 each to Josephine, Katherine and Cora.

It is conceded that in 1927 testator was sound in body and mind and there is no intimation that the will of April 5, 1927, was other than the embodiment of testator's own desires. All wills bequeath the residue of testator's estate to his six daughters. The 1933 will was executed six days after the death of testator's wife. The first codicil (1935) was executed sixteen days after Cora's marriage. It annulled the $1,000 special legacy to her, her marriage having been opposed by testator. The second codicil (1936) was executed three days after certain property was acquired from one Dielmann. This codicil changed the trust *res* for the unmarried daughters from the Bemiston Avenue to the Dielmann property. The last will, executed two days after the Conway Road property was acquired, devised the Conway property in trust for the unmarried daughters.

In addition to the charge of testamentary incapacity, the petition charged undue influence by Katherine and Josephine and conspiracy by them to cause testator to convert substantially all his property

into the Conway Road property in order to create a trust for their benefit.

It is important, therefore, to review the history of testator's property holdings. In 1934, when his employment by the City of Clayton stopped, testator owned the home on Bemiston Avenue, property on Denny Road and two parcels of land in Texas. His then indebtedness does not appear. The Denny Road property was sold for $32,800 and testator received a note for $24,000 secured by deed of trust. On December 28, 1934, the $24,000 note was pledged as collateral to secure a loan of $10,000. Apparently the proceeds of this loan were used to take up prior obligations and notes testator had signed for his daughters and others. On August 12, 1936, testator acquired from one Dielmann a house and 15 acres of land on Zimmer Lane. The consideration was $11,500, of which $6,950 was paid by executing a note and deed of trust on the property. In September, 1936, a contract was entered into for repairs on the property, but before the repairs were finished, or the property was occupied, it was sold for $19,500 and a profit of approximately $3,000 realized. How the consideration was paid does not appear. In the meantime, testator, on January 7, 1937, borrowed $4,000 on the Bemiston Avenue property. On July 15, 1937, the Conway Road property was acquired, apparently for $7,500. On July 30, 1937, a contract was made for repairs on this property and for the addition of two rooms and a bath. Testator moved into the property November 11, 1937. On November 16, 1937, a contract was signed for the sale of the Bemiston Avenue property for $9,000. The $4,000 loan against the property was raised to $5,000 and the property conveyed subject to this encumbrance. The inventory of testator's estate shows the Conway Road property appraised at $12,000, the Texas properties $340 and $108, and personal assets $9,936.42, of which $1700 was due from Lydia, $100 from Katherine and $2,063.96 from Anna. The ▮▮▮ amount of liabilities does not appear, except that $2,224.30 was due for repairs on the Conway Road property.

Prior to 1934 and under oral authority from her father, Cora assisted him in looking after his financial affairs. By arrangements with the banks both signed all checks, but when Cora planned to marry against her father's wishes, a settlement was had and she turned over all papers to him. Later testator became liberal in signing notes for his daughters and others. Upon Katherine's suggestion, but with the written consent of all sisters except Cora, Katherine was given a power of attorney. She attended to certain business for testator; however, testator signed all checks with her, and the power of attorney and all contracts, deeds, notes and deeds of trust were executed by testator personally. There was evidence that Cora and Katherine, both, signed the collateral agreement with the bank, with testator. In

November, 1937, when testator was suffering with arthritis and neuritis he signed by mark and his mark was witnessed by others.

Emma, Anna and Cora are contestants. Emma married and left the home in 1905. Apparently her husband was not on friendly terms with testator. Anna did secretarial work for twelve years, but married in 1915 and left the home. Her husband died in 1930, but she did not return to the home. Cora taught school for sixteen years and then married a police officer. The marriage was opposed by her father and sisters. Josephine, Katherine and Lydia are proponents. Josephine had spent her entire life (59 years) at home and cared for her mother and father in their last illnesses. She never married. Katherine was a registered practical nurse. She married in 1901, was divorced about 1911, and returned to her father's home. Lydia married and raised a family, but was residing in the home when her father died.

The circumstances attending the execution of the will were shown only by proponents' witnesses. On July 15, 1937, testator talked to one Stevens, an attorney, on the telephone with reference to changing his will and leaving Cora out. A new will was advised and a letter of instructions requested. The letter of instructions was written. It directed the Conway Road property be substituted for the Bemiston Avenue property as the trust *res*; and that Cora's name be omitted from the section providing $1000 legacies and the paragraph naming executrices. The letter, forwarded in a sealed envelope, was accompanied by the 1933 will and the two codicils. That the letter was in testator's handwriting and was written and signed by him was not disputed at the trial. The will was prepared by Mr. Stevens, was returned, and later executed by testator. One of the subscribing witnesses testified as to the details of the execution of the will, the conversation had with testator, then gave his opinion that testator was of sound mind when the will was executed. Certain proof as to signatures was stipulated.

Contestants offered no direct evidence as to the mental or physical condition of testator on the particular date of the execution of the will, but covered the general period, before and after. Testator's daughters, Cora and Anna, were the principal witnesses for contestants. Cora testified that in 1934, in filling out applications for permits for excavations in the streets, testator would get water permits mixed with gas permits; that he was asked to resign his position with the city; that by agreement with the banks two signatures were required on his checks; that he was hard of hearing; that he was a large man and his legs had given out; that he walked with a cane; that he held to both rails in getting up and down stairs; that there was no bath on the first floor and in 1933 and 1934 he would "relieve himself in the daytime" on the front porch or in the yard; that on one occasion he cut a splint off his finger after the doctors had put it

on; that in a pinochle game in 1936, he "would never know who led, who his partner was, or who it was trumped it," and "sometimes he had to be told what was led;" that, after 1932, his daughters shaved him; that he wore flannel underwear and took a hot water bottle to bed with him, summer and winter; and that he sat in his chair with a blanket over his knees.

In 1934 and 1935 he had an apparatus to get in and out of the bath tub to keep from falling and he would get up in the night, take a bath and splash water out of the tub. He wore eyeglasses and used them up until the time of his death. He pulled hair out of his nostrils and scratched brown spots on the back of his hands, irritating the skin. In 1933 and 1934, he made statements accusing the doctor of causing the brown spots and irritation. He thought that a high forehead denoted intelligence and in 1933, before a mirror by the window, he would pull out hair from his forehead, leaving a streak.

He would sit in his chair with his eyes closed and his mouth open and you had to speak loud to let him know you were there. In May, 1937, Cora saw him using both hands to eat, one to lift the other. He had laryngitis for three weeks in 1937. He became bedfast in September, 1937, and was moved to the new home in an ambulance. On her visits after that he had his shoulder drawn up, pains in his arms, no feeling in his legs, and his neck was stiff. On one occasion she came in his room and he thought she was Anna. Over objection she was permitted to testify that, upon the facts stated by her, in her opinion her father was of unsound mind in July, 1937.

On cross-examination she admitted her father opposed her marriage and had her make a settlement of his affairs; that she accepted the transfer of an automobile title from him in 1933; that she accompanied him when he made the wills of 1927 and 1933; that she signed his checks and transacted his business on his oral authority until February, 1935; that he was alright then, except in some instances; that he signed notes for her and Anna in 1932 and 1933 and paid them; that on March 2, 1935, he paid money to her which Anna had borrowed; and that he told her, if she would stay at home, he would leave the place in trust for her. She identified a sheet in testator's handwriting showing notes paid off for Anna between 1917 and 1935.

Anna testified that, towards the last, her father could not use the telephone and was deaf as he could be; that he could not walk without assistance and would have others use the telephone for him; that he was very old, slept much, made "terrible faces" when he slept, scratched his hands, and at one time got white shoe polish and put it on his hands by mistake for his "lotion." Once or twice in 1937 she saw her father when he appeared to be reading a newspaper, but when asked, he didn't remember what he had read. She said that he read patent medicine ads and would send for such medicines to keep from

getting old; that Josephine would get the pills and burn them; that Josephine said she had told the mail carrier to ring the door bell when there was mail for her father, but otherwise to put it in the mail box; that once in the spring of 1937 witness went to his room and he thought she was Emma; that at times he called her Cora; that in 1932 he took a splint off his finger and threw it in the fire and said the finger was alright; that he pulled his hair and was careless in his habits, as testified to by her sister; and that he thought Germany was the only country in Europe. She said her father was vain, good looking, susceptible to flattery and easily influenced by it; that he had three or four pairs of glasses and "could read and write anything simple up to the time of his death;" that she hadn't seen him write any letters; and that he liked to talk, especially about his early experiences, but would not keep on one subject any length of time. On one occasion, in September, 1934, he forgot about having pledged the $24,000 note as collateral for a loan, and refused to believe it, until he went and looked in his lock box and saw it was gone. On the basis of the facts stated by her, and over objection, she said that in her opinion her father was not of sound mind in July, 1937.

On cross-examination she said she charged groceries to him with his consent in 1936 after she lost her job; that in July, 1935, he paid a $450 note for her; that he was of unsound mind when he endorsed a $1135 note for her; that he would have days when he would act like he was in a coma; that his mind was unsound when the power of attorney was signed for Katherine, although she signed an approval of the appointment; that his mind was unsound when the Denny Road property was sold for $32,800, but he took her advice and sold it; that she drew up the papers which her father signed for the purchase of the Dielmann property; that she recommended its purchase; that the price was agreed upon between Mr. Dielmann and her father, but her father was incapable of transacting business then or when the property was sold at a profit of $3,000.

Emma testified her father was "of unsound mind at times;" that the power of attorney was signed up so her father could not sign any more notes; that all endorsed their approval, except Cora; that witness signed it before her father and when he started to read it, he couldn't finish it and her sister explained it to him; that it was signed so Katherine could help with his affairs, but that Katherine had said they had to do something or he would spend all of his money. She admitted her father paid her taxes for her in 1934.

Charles Dielmann testified that Katherine handled the transaction when he sold his property to testator, but testator signed the contract, the notes and deed of trust; that he had dinner with testator; that testator talked much of old times; that the contract was signed when Katherine and Anna were present; and that he had

priced the property for $15,250, but closed the deal with testator for $11,200.

Alfred Kerth testified testator was much aroused about rumors before Cora was married and said he was having trouble at home; that he had to speak loud to testator when the agreement was made to pledge the $24,000 note as collateral in December, 1934, but that testator's mind was perfectly sound when the 1933 will was written and when the collateral agreement was signed.

Dr. H. A. Goodrich saw testator September 17, 1937 to treat his hands for chronic dermatitis, an inflamed condition of the skin causing intense itching and burning. On September 29, 1937, witness had made a notation on his records that testator was mentally confused. He said testator was suffering from chronic arthritis and arteriosclerosis or hardening of the arteries; that his mentality was about the usual of any one of his advanced age; and that the conditions he observed did not come on suddenly.

There was evidence that on one occasion in 1937 he did not recognize a city employee he had known, until the man gave his full name; that two months before he died he asked a visitor about a man that had been dead for several years, about Mayor Atwood, who was out of office, and about the city campaign, when none was on in the off year; and that he had said he wanted to sell the Denny Road property (sold in 1934). We shall later refer to proponents' evidence.

On the question of undue influence, in addition to contestants' evidence previously stated, there was evidence that in 1937 no callers were present at any time Cora visited her father; that in May or June a caller came, but was not permitted to see testator; that a Mr. Fuszner tried to see him in 1936 to get an affidavit to establish the age of a friend, but Josephine said her father was playing cards in the other room and she didn't think he could remember just how old this man was anyway and she didn't care for him to sign any papers; that after 1934 when Cora visited her father, her sisters were there in his presence at all times; that in 1930 testator said he wanted a composition roof put on the Bemiston Avenue house, but Cora, Josephine and Katherine said they were going to have a shingle roof put on, and a wood shingle roof was put on. In 1933 Josephine burned testator's 1931 will, but the circumstances, and how the will came to be burned, do not appear. In 1933 testator said, "I am going to give Em (Emma) $1,000, I have never given her anything," and Katherine said to Anna, "We certainly will have to take care of his money; he wants to give Emma $1,000 and I told him, he didn't have $1,000 to give away." Before the Dielmann property was purchased, "Katherine was trying to locate some property where she could have started a convalescent home out in the county" and the Dielmann property met her requirements. In September and October, 1938, and long after her father's death, Katherine, while residing in the

Conway Road property, placed advertisements in different papers offering room and board for aged and infirm convalescents, with nurses' care.

After the power of attorney was executed on February 28, 1935, Katherine wrote out her father's checks for him and signed them after he signed them. There was an understanding with both banks where he kept a checking account about the situation. Katherine became familiar with her father's financial affairs from the time the power of attorney was executed. Katherine said to Josephine, in Anna's presence, "Well, when I get my hands on that money, we are going to get everything we want, we are going to buy everything we want, and when he closes his eyes there won't be anything left for the in-laws." Testator had a safety deposit box in the First National Bank and Katherine had access to it. About the middle of July, 1937, Anna heard Josephine request her father to sign a paper and also heard her say that she wanted him to copy the paper just the way it was and told him she would bring the table and ink. No statement was made as to what the paper contained. The paper had something written on it, but witness was not shown the paper. The content of the paper and whether it was actually copied or signed by testator did not appear from the testimony.

While testator had laryngitis, in August, 1937, and was lying on his couch, his daughter, Anna, took a newspaper and ▮▮▮▮ showed him the advertisement where her home in Clayton was advertised for sale under foreclosure. She told him it was the foreclosure of her place and that she guessed she would have to lose it. While she was telling him this, Katherine and Josephine were in the kitchen and heard her speaking loudly to her father. One of them came in and grabbed the paper out of her hand and said, "He can't be bothered with anything like this."

After the Dielmann property was purchased in 1936, Anna inquired of Katherine about what was being done with her father's property and about the cost of different things, but received no answer, only that they didn't have the bills and that the bills weren't in yet. About a year before testator died, Katherine, in the presence of her father, but speaking so he couldn't hear, told Anna, "I am going to get him to sign some blank checks so if anything happens to him, we have got those checks on hand."

Testator told Joe Kattmann in 1937 that he had lived in the Bemiston Avenue place so long he would like to live there the remainder of his days, but that "they thought it would be better for him to go out in the country where the bathroom would be on the first floor." Katherine and Josephine, also, asked Joe Kattmann to tell testator that it would be best for him to go out to the country. According to Anna, in July, 1937, Katherine returned home and her niece inquired "Did you get it" and she said, "Yes, I bought it" and Katherine then

said to her father that she had bought a place that morning out on the Conway Road. Her father inquired whether it had a house on it, what she paid for it and how large the acreage was and was advised that it was on Conway Road; that it had a house and septic tank, that she paid $7,500; and that it had three acres. In 1936, Josephine said to Anna Brand, "We only let him read what we want to."

Katherine was present when the codicil of August 15, 1936, which changed the trust res from the Bemiston Avenue property to the Dielmann property was prepared. She did most of the talking to the attorney and her father said very little. During the conference, Katherine was heard to say: "Dad, this is to change the address." Katherine did not consult Emma and Cora about testator's business after they consented to the execution of the power of attorney. Katherine bought all of testator's clothes for him, paid all bills and household accounts, and "handled his financial affairs." The foregoing is, we believe, a fair statement of contestants' evidence on the two issues.

Numerous witnesses were produced by proponents. Some were near neighbors and old friends of testator who had known him a long time, and had visited and played cards with him during the last years of his life. Others had transacted business with him in the buying and selling of land, the making of contracts, or in the preparing and witnessing of prior wills and codicils. This evidence is too extensive to be set out here. The witnesses testified that testator was of sound mind, until long after the execution of the last will. Many of the statements of contestants' witnesses, heretofore set out, were expressly denied, but we are not concerned here with the weight and value of evidence, but only as to whether there was any substantial evidence to show either lack of testamentary capacity or undue influence. Little of proponents' evidence aids contestants' case and little is referred to by contestants in argument. Evidence mentioned is that Katherine admitted that testator had cataracts on both eyes, and that she wrote out most of testator's checks for him after 1935; however, she said he could read and did read the papers until about October, 1937, and that he signed all checks with her.

Did appellant make a case for the jury on the issue of testamentary incapacity? "A will contest is an action at law and the weight of the evidence and credibility of the witnesses are questions for the jury, and the most favorable evidence rule, when the sufficiency of the evidence is challenged, applies in a will contest the same as in any other case." [Callaway v. Blankenbaker, 346 Mo. 383, 141 S. W. (2d) 810, 813; Townsend et al. v. Boatmen's National Bank et al., 340 Mo. 550, 104 S. W. (2d) 657, 665.] Proponents made prima facie proof of testamentary capacity, and, in order to make a submissible case for contestants, it was necessary that there be substantial evidence that on July 17, 1937, testator did not possess the necessary mental capacity to make a will. [Fields v. Luck, 335

Mo. 765, 74 S. W. (2d) 35, 39; Schoenhoff v. Haering, 327 Mo. 837, 38 S. W. (2d) 1011, 1015; Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739, 752.] ''Substantial evidence is evidence from which the triers of the fact reasonably could find the issue in harmony therewith.'' [State v. Gregory, 339 Mo. 133, 96 S. W. (2d) 47, 52.] In this connection it may be noted that ''evidence of occurrences and circumstances prior to and closely approaching the time of the execution of the will, and shortly subsequent thereto, which tend to shed light on the question of testamentary incapacity and tends to show the condition of testator's mind at the time of the execution of the will, is competent, and it is not required that proof of testamentary incapacity at the very moment be made by eyewitnesses.'' [Schoenhoff v. Haering, supra, 327 Mo. 837, 38 S. W. (2d) 1011, 1015.] But, unless the evidence was sufficient, in view of all the circumstances in the case, to warrant the jury in finding that testator did not have testamentary capacity on said date, the directed verdict sustaining the will was proper. It may be conceded that, ''Such a demurrer can be sustained only when the facts in the evidence and the legitimate inferences therefrom are so strongly against the verdict as to leave no room for reasonable minds to differ.'' [Townsend et al. v. Boatmen's National Bank et al., supra, 340 Mo. 550, 104 S. W. (2d) 657, 665.] In determining the sufficiency of contestants' evidence, we must accept their evidence as true, disregard proponents' evidence, unless it aids contestants' case, and give contestants the benefit of every favorable inference that may be legitimately drawn from the whole evidence. [Fowler v. Fowler, 318 Mo. 1078, 2 S. W. (2d) 707, 709; Beckmann v. Beckmann, 331 Mo. 133, 52 S. W. (2d) 818, 819; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, 953.] Contestants' evidence, however, must be considered as a whole, not merely a part of it isolated from the rest, and outstanding conceded facts may not be disregarded. [Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400, 409; Skidmore v. Haggard, 341 Mo. 837, 841, 110 S. W. (2d) 726, 727; State ex rel. Gosselin v. Trimble, 328 Mo. 760, 41 S. W. (2d) 801, 805.]

In determining the sufficiency of evidence on demurrer, ''the court may properly reject evidence which is contrary to the physical facts, or to known physical laws, or which is the result of evident mistake or ignorance, or, in short, when the evidence itself, or the other established facts, discloses its inherent infirmity. In doing this, however, the court does not weigh the evidence in the judicial sense of that term.'' [Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079, 1082; State ex rel. Kansas City Southern Ry. Co. v. Shain, 340 Mo. 1195, 105 S. W. (2d) 915, 920; Grange v. Chicago & Eastern Illinois Ry. Co., 334 Mo. 1040, 69 S. W. (2d) 955, 961.] In this case evidence of testator's condition before and after the date of the execution of the will has no probative value,

unless it raises a reasonable inference as to testator's mental condition at the time he signed the will. [Whitacre v. Kelley, 345 Mo. 489, 134 S. W. (2d) 121, 124.]

██ Considering the evidence most favorable to contestants, it tended to show that testator was an old man, 91 years of age when the will was executed; that he was hard of hearing and slept much; that he was forgetful, made mistakes, had certain peculiarities and was careless in his habits; that on occasions he confused the names of his children when they came into his room and sometimes called one by the name of another; that he was careless in looking after his financial obligations and in signing notes for his children and others; that, being unable to get out and look after his financial affairs, he relied on his daughters; that he had good days and bad days; that he was susceptible to flattery; that on one occasion he was a poor card player; that he didn't recognize certain visitors until their full names were given; and that he had chronic dermatitis, arthritis and arteriosclerosis, conditions which did not come on suddenly. On the other hand, the evidence shows that he was able to read, write and sign his name; that he read papers, and signed deeds, mortgages, checks and contracts in his own name; that at the time the will was signed his room was on the second floor at the Bemiston Avenue property; that he slept upstairs at night and came down during the day; that after he had celebrated his 91st birthday with his daughters on July 4, 1937, and after the will was written he became sick with laryngitis for three weeks in August; that he became bedfast in September; that he failed rapidly the last six months of his life; that when a doctor was called in September, he came to treat his hands; that not until September 29, 1937, did the doctor make a notation that he was "mentally confused;" that in September testator's mentality was about the usual of anyone of his advanced age, and that testator died December 21, 1937, of the infirmities of old age.

" 'A testator with mind enough to understand,' the ordinary affairs of life, ██ the kind and extent of his property, who are the natural objects of his bounty, and that he is giving his property to the persons mentioned in his will, in the manner therein stated, is capable of making a will under the law of this State." [Rex et al. v. Masonic Home of Missouri et al., 341 Mo. 589, 108 S. W. (2d) 72, 84; Pulitzer v. Chapman, supra, 337 Mo. 298, 85 S. W. (2d) 400, 414-416.]

Was there substantial evidence that, on the date testator executed the alleged will, he did not have mind and mentality enough to understand the ordinary affairs of life, or the value, nature and extent of his property, or the number and names of the persons who were the natural objects of his bounty and with reference to their conduct and treatment of him, their capacity and necessities, or that he did not have active mind memory enough to know he was giving his property to the devisees mentioned in his will, in the manner therein stated.

Contestants' position is not that testator "was a maniac or insane in any violent sense, but simply that he had failed to such an extent that he did not have sufficient mental capacity left to attend to any business or to make a will;" and that when the contested will was executed "testator was a feeble old man, 91 years of age, whose mentality had become so weakened from extreme old age that the irreducible mind which the law requires for testamentary capacity was gone." Reference is made particularly to Dr. Goodrich's testimony that on September 15, 1937, testator was feeble and hardly able to walk and was suffering from the chronic conditions heretofore mentioned; and that on September 29th the witness noted that testator was "mentally confused." Much is attempted to be made of his peculiarities, his deafness, and certain other detailed facts heretofore set out. It is contended that testator's statement, two months before he died, that he wanted to sell the Denny Road property (sold in 1934) and the fact that in 1934 he forgot that he had pledged the $24,000 note as collateral was evidence that he didn't know the nature and extent of his property when the will was executed in July, 1937. However, it appears from contestants' evidence that testator's condition changed materially between July 15th and October 21st. The incident of 1934 was an instance of forgetfulness, but whether the note was pledged for debts or not, did not affect the value of testator's net assets. It is contended that, since on one occasion in the spring of 1937 when Anna went to his bedroom he thought she was Emma and once when Cora went in his room, he said "I thought you were Ann" and, because he sometimes called one daughter by the name of another, that he didn't know the objects of his bounty. Such a conclusion could not be drawn from the evidence. Reference is further made to the opinions of Anna and Cora, lay witnesses, that on the facts stated by them the testator was of unsound mind in July, 1937. We think that the opinions of these lay witnesses, not being based on facts, inconsistent with sanity, were wholly valueless. [Burkemeier v. Reller (Mo.), 37 S. W. 430, 431; Lee v. Ullery, 346 Mo. 236, 140 S. W. (2d) 5, 9.] Such statements of opinions do not compel a submission of the issue of testamentary capacity to the jury. [Smarr v. Smarr, 319 Mo. 1153, 6 S. W. (2d) 860, 864.]

In this case, considering contestants' evidence as a whole and in connection with conceded facts, we are of the opinion that there was no substantial evidence of lack of testamentary capacity at the time the will was executed and that contestants did not make a submissible case for the jury on the issue of testamentary incapacity. [Callaway v. Blankenbaker, supra; Rex et al. v. Masonic Home of Missouri et al., supra; Smarr v. Smarr, supra.]

Did contestants make a case for the jury on the issue of undue influence? "By 'undue influence' is meant such influence as amounts to force, coercion, or over-persuasion, which destroys the free agency

or will power of the testator." [Sehr v. Lindemann, 153 Mo. 276, 54 S. W. 537.] "Undue influence, to be effective in breaking a will, must have been present, in active exercise, and sufficient to destroy the free agency of the testator at the time of the making of the will, so that the will is not 'in fact his own will, but that of the party who was exercising the undue influence.' (Citing cases.) But the law does not ban as undue the natural influence of affection or attachment or desire to gratify the wishes of one beloved or trusted by testator." [Beckmann v. Beckmann, supra, 331 Mo. 133, 52 S. W. (2d) 818, 823; Larkin v. Larkin (Mo.), 119 S. W. (2d) 351, 358; Kadderly v. Vossbrink (Mo.), 149 S. W. (2d) 869, 874.] "Undue influence need not be shown by direct ▓ evidence. It may be shown indirectly and arise as a natural inference from other facts in the case. It must not rest on mere opportunity to influence, or on mere suspicion." [Teckenbrock v. McLaughlin, 209 Mo. 533, 550, 108 S. W. 46, 51; Fowler v. Fowler, supra.] However, "it is fundamental that it is not the existence of undue influence, but the exercise of it in the execution of the will which invalidates such will." [Gibony v. Foster, 230 Mo. 106, 137, 130 S. W. 314, 324.]

▓▓ Was this will the result of undue influence? Each of the preceding three wills had contained a similar provision leaving the Bemiston Avenue home in trust for testator's unmarried daughters. Each contained a provision for $1,000 legacies to Katherine, Josephine and Cora, with residue to the six daughters. It is conceded that testator opposed Cora's marriage, demanded a settlement of his business affairs, and that on November 16, 1935, sixteen days after her marriage, testator by codicil annulled the $1,000 legacy provided for her in the will of 1933. It is further conceded that, after the Dielmann property was acquired at the instance of Anna in August, 1936, that testator, within three days after the date of the deed, executed a codicil changing the trust res for his unmarried daughters to the proposed new home. The only change actually made by the last will was the designation of the Conway Road property as the trust res. The Dielmann property, designated as the trust res by the codicil of August 15, 1936, had been sold early in 1937 and no other property had been substituted. When the Conway Road property was acquired as a proposed home, it was designated as the trust res. The sale price of the Bemiston Avenue property in November, 1937, was $9,000. The purchase price of the Dielmann property in August, 1936, was $11,500 and its sale price in 1937 was $19,500. The purchase price of the Conway Road property in July, 1937 was $7,500 and its inventory appraisement after repairs was 12,000. The last will, therefore, designated trust property of less value than the codicil of 1936 or the will of 1933, although subsequent improvement increased its value. Again, apparently, there had been no "drastic shrinkage" in testator's estate. The $14,000 equity in the $24,000 note, the

Bemiston Avenue residence and the Texas properties are mentioned for 1934, while the Conway Road and Texas properties and $9,936.42 in personal property, less the bill for repairs, remained after his death in December, 1937. On the record it does not appear, either, that the contested will of 1937 devised the major portion of testator's property in trust for his unmarried daughters; or that it devised property of greater value than had been previously devised, or that there had been such a "drastic shrinkage" in testator's estate.

On the question of undue influence contestants rely particularly on the testimony of Anna, that about the middle of July she heard Josephine request her father to sign a paper and to copy a paper just as it was, and the attempted inference is that the copy was made by testator and that the copy was the letter of directions to Attorney Stevens, which was in evidence. We think this evidence did not rise above speculation and conjecture and was wholly insufficient upon which to base such an inference. The demurrer did not admit forced and violent inferences. [Beckmann v. Beckmann, supra, 331 Mo. 133, 52 S. W. (2d) 818, 820.]

It is contended further that callers were systematically kept away, because none were present when contestants came and because one caller was turned away. Contestants say proponents had a settled policy of never allowing contestants to be alone with their father. The evidence was that Cora and Emma came on an average of once each week, after 1934, and that Anna came almost every night in 1937 and Katherine and Josephine were always there. Reference is made to the testimony that Josephine had burned the will of 1931, and it is said that this "alone is definite evidence of domination." Whether the will was burned intentionally or by accident or inadvertance or by direction of testator does not appear. Reference is made to Josephine's burning of patent medicine pills, or rejuvenating medicines, to the fact that Katherine bought testator's clothes, had a power of attorney, had access to his safe deposit box, paid the bills for the household, wrote out the checks and signed them with her father, and handled the preliminaries and the closing of the purchase of the Conway Road property. Contestants say that testator was physically and mentally helpless and dependant upon Katherine and Josephine, and that they were in "complete and continuous domination" of testator's person and property. It is also contended that Katherine occupied a fiduciary relationship and was in charge ■ of his business, however, except for the conversation about the alleged purchase of the Conway Road property there is no evidence that Katherine did more than attend to his business at his direction. Whether she was a fiduciary or not is immaterial here, since we find no facts or circumstances from which it can be inferred that either Katherine or Josephine were active in any way which caused or assisted in causing the execution of the will or the drafting of the particular terms of the

72

will. [Pulitzer v. Chapman, supra, 337 Mo. 298, 85 S. W. (2d) 400, 409; Loehr v. Starke, 332 Mo. 131, 144, 56 S. W. (2d) 772, 777; Rex et al. v. Masonic Home et al., supra, 341 Mo. 589, 108 S. W. (2d) 72, 86.]

After a careful review of the whole of contestants' evidence and considering the same as true, disregarding proponents' evidence, except as it aids contestants' case, and allowing all favorable inferences that a reasonable person could draw from all the evidence, we are unable to find any evidence from which a reasonable and favorable inference can be drawn that the will was the result of undue influence. We find no substantial evidence that Katherine and Josephine ''unduly influenced'' testator in the execution of the purported will or that prior thereto they conspired to influence and did influence testator to convert substantially all of his property into the Conway Road property and to leave it in trust for them.

There remains only the question of the excluded evidence. For example, that testator ''was practically helpless;'' that he had ''difficulty in reading and seeing;'' that he ''did not grasp matters of that kind (contract pledging collateral) as readily as other people;'' that his ''mind would wander;'' that Katherine was ''dusting around and nosing into everything;'' that ''they never allowed you to be alone with him;'' and when testator was asleep ''he looked like he was dead;'' and that during 1934, when anyone called ''we would always have to tell him . . . who the visitor was.'' We have carefully considered all of the excluded evidence and the particular circumstances under which it was refused. If admitted, it would have added little, if anything, to the facts already in the record and, even if all of it were considered in connection with all of the other evidence in the record, favorable to contestants, the whole evidence would still be insufficient to sustain a verdict of a jury, either, that testator lacked testamentary capacity or that the will was procured by undue influence. The error, if any, therefore, in the exclusion of the evidence does not require a reversal of the cause. [Look v. French, 346 Mo. 972, 144 S. W. (2d) 128, 132.]

Our conclusion upon the whole case is that there was no issue for the jury on either testamentary incapacity or undue influence and that the trial court properly directed a verdict sustaining the will. The judgment is affirmed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.