Robert Hume THOMPSON et al.,
Respondents,

v.

The CURATORS OF the UNIVERSITY OF
MISSOURI, a corporation, and Slater Meth-
odist Church, Slater, Missouri, a Pro Forma
corporation, Appellants.

No. 56220.

Supreme Court of Missouri,
Division No. 2.

Jan. 8, 1973.

Rasse & Rasse, Robert L. Rasse, Wil-
liam A. Peterson, Marshall, for respondents,

**618**

Robert Hume Thompson, James Hyatt Thompson and Joe Elmer Thompson.

Jackson A. Wright, Marvin E. Wright, Columbia, for appellant The Curators of the University of Missouri, James & Butterfield, A. Lamkin James, Marshall, for Slater Methodist Church, appellants.

MORGAN, Presiding Judge.

Joe H. Hume, a bachelor and resident of Saline County, Missouri, died on December 27, 1967. Thereafter, a document dated March 27, 1967, was admitted to probate as his last will and testament. His nearest relatives, three nephews, filed this will contest suit. The sole and only issue raised for trial was decedent's testamentary capacity on the date the purported will was executed. The jury sustained contestant's position and found that the questioned document was not the will of the decedent. Two residuary legatees, the University of Missouri and the Slater Methodist church, have appealed. We affirm.

The record reflects that the case does not involve an unusual set of facts nor any novel questions of law. On appeal, appellants submit that the judgment entered on the verdict returned should be reversed, because: (1) the contestants failed to make a submissible case, (2) lay witnesses were allowed to express opinions relative to the mental state of decedent absent a factual basis for such conclusions, and, (3) the trial court unduly restricted cross-examination by appellants-proponents of the witnesses for contestants.

▉ The objective and extent of our review is well fixed. As said in Sturm v. Routh, Mo., 373 S.W.2d 922, 928[2]: "In our consideration of this appeal we must bear in mind that the question is not what conclusion this court would reach upon a review of the evidence in the transcript, nor the result we may think the jury should have reached, but only whether there is *some substantial evidence* in the record from which a jury could reasonably have found that testator did not have sufficient testamentary capacity at the time he purportedly executed . . . [the will on March 27, 1967.]" Also appropriate, and consistent therewith, is the observation made in Machens v. Machens, Mo., 263 S. W.2d 724, 734[16], that: "Nothing in our jurisprudence is more firmly established than the rule that a jury's verdict is final (and not reviewable) on the fact issues, if its findings are supported by substantial evidence, and that our review of that question is limited to determining whether the evidence, considered most favorably to the result reached by the jury, is substantial evidence from which the jury could reasonably reach the result it did. See West's Missouri Digest, Appeal and Error, ▉989, 999, 1001, 1002 and 1003. Of course, in this case, the jury could have taken a different view (and there was much evidence to support a different view) but, since there was substantial evidence to support the verdict, conflicting evidence is wholly immaterial on the issues (submissibility of mental incapacity . . .) presented for our decision on this appeal." In this light, after noting that the proponents did present prima facie proof of testamentary capacity, we consider whether or not contestants produced substantial evidence *that the decedent was incapable of making his will at the time he attempted to do so.* In this case, such a task is not difficult.

Witnesses offered by contestants included three doctors and five lay persons. Each expressed the opinion that decedent was mentally incompetent on the dates of interest. In answer to the hypothetical question posed, each doctor gave as his expert opinion the conclusion that decedent on March 27, 1967, lacked the required capacity to meet the standard of mental competency called for by the law of this state. Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664, 669[2–4]; Rex v. Masonic Home of Missouri, 341 Mo. 589,

108 S.W.2d 72, 84[4]; Callaway v. Blankenbaker, 346 Mo. 383, 141 S.W.2d 810, 814 [4]. One indicated that decedent was "a portrait of insanity." Such testimony was not premised solely on the facts outlined in the hypothetical question. Each doctor had either known decedent for years or had examined or observed him at times near the date of the execution of the document. One such date was as close as March 17, 1967.

■ As to the lay witnesses, ". . . the rule is that the opinion of a lay witness as to the soundness of mind of a person whose mental condition is under investigation has no weight or value unless such opinion is based upon a knowledge of facts inconsistent with sanity . . .." Lewis v. McCullough, Mo., 413 S.W.2d 499, 504; Barnes v. Marshall, Mo., 467 S.W.2d 70, 77. In view of appellants' argument that such a foundation was missing, we have considered the same, but to avoid repetition we summarize a part of such testimony as follows: decedent imagined that his chimney had fallen down and needed a bricklayer but could not recall making the statement; imagined that people were in his yard yelling at him and raking boards up and down the side of his house; was unable to discuss whether or not his bills had been paid; never washed his eating utensils; after decedent's neighbor fed decedent's stock decedent would refeed them two or three times a day; soiled himself, his bedding and his car with bowel movements and did not seem to object to it; would not sign checks to pay outstanding bills; would arise at 2:00 to 3:00 A.M., dress with one sock on and one shoe on the other foot; thought he was married and needed to go to St. Louis to get his wife; while at his nephew's in Madison, Missouri, thought his own farm was just over the hill; was obsessed with counting his cattle and constantly wanted to recount them; would not know acquaintances in whose homes he had visited and had meals; on the evening of March 26, 1967, imagined someone was outside his nephew's home flashing a light into the window at him; accused his friend Howard Page of stealing his log chain; was found under his kitchen table confused and mixed up; got lost in his own field and wandered around in circles and could not get his bearings and did not know where his house was; did not know relatives and friends at Fitzgibbon Hospital; would come to visit his neighbor but would talk and mumble to himself and was unable to answer questions; that he would attempt to go home but would go the wrong way and have to turn around; would sit and talk to himself but could not answer a question; did not always remember when his nephew Joe had been to see him; mistook his neighbor's wife for either or both of his nephews' wives and confused his neighbor with his nephew Jim; on March 29 did not know what he was signing at the Home in Concordia; early morning of March 31 was up, cursing attendants, unmanageable, threatened attendants when they tried to give him a hypo to calm him; tried to leave the rest home repeatedly and left one night in a pouring rain walking with the help of a walker, was attempting to find his cattle to feed them and was found two and one-half blocks away; made threats to the nurses that he'd hit them if neccesary; another early morning left the home going out to feed his cattle, fell outside, grabbed the nurse's ankle and tore her uniform; had to be discharged because he was unmanageable and a danger to the personnel and residents; while at the rest home in Concordia thought the adjacent cornfield was his own and that Joe Thompson had let "them" tear down his home and remove his stove.

■■ As said in Barnes v. Marshall, supra, 467 S.W.2d 1. c. 78: "We think it is obvious that each witness detailed sufficient facts upon which to base the opinion stated. Those facts went far beyond a mere showing of peculiarities and eccentricities. They were clearly inconsistent

with the conclusion that testator was of sound mind." The evidence before and after execution of the document was sufficient to raise a reasonable inference as to his mental condition on the date of execution of the same. It is not required that proof of testamentary incapacity at the very moment be made by eyewitnesses. Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135. On the record before us, points one and two are ruled against appellants.

■ Lastly, we consider the individual complaint of the university that its right to cross-examination was unduly restricted by the trial court. At the start of the trial, counsel for appellants asked for separate cross-examination of respondents' witnesses. The trial court suggested that: "As indicated earlier in our conversations, I'm going to permit you both to ask questions on voir dire; but I still feel that in view of the fact there is just one ultimate issue and both defendants are interested in that same one issue that cross-examination should be confined to one lawyer or the other; of course the court will allow you plenty of time to confer, but as I also suggested earlier, if something arises that has some special significance to one defendant or the other, if you will request the court at that time I'll make a ruling whether or not I'll allow both of you to cross-examine the same witness."

■ Section 491.070, RSMo 1969, V.A. M.S., provides that a party against whom a witness has testified shall be entitled to cross-examine such witness. 58 Am.Jur., Witnesses, § 611, p. 340. Such a right and the limitations thereon have been considered often by this court. For instance, in Pettus v. Casey, Mo., 358 S.W.2d 41, l. c. 44, it was said: "The right to cross-examine a witness who has testified for the adverse party is absolute and not a mere privilege. * * * A trial court may properly exercise its discretion as to the scope and extent of cross-examination, but it is not within the court's discretion to

prevent cross-examination entirely." More specifically, as expressed in Krez v. Mickel, Mo., 431 S.W.2d 213, l. c. 215: "The extent and scope of cross-examination in a civil proceeding is discretionary with the trial court and its rulings with respect thereto will not be disturbed unless an abuse of discretion is clearly shown." In connection with a case involving multiple defendants, the general rule, as stated in 98 C.J.S. Witnesses § 368, p. 116, is: "Where there are several codefendants, counsel of each may cross-examine plaintiff's witnesses, and in a consolidated action any party may cross-examine the witnesses of any other party; but it is undesirable for more than one attorney to cross-examine the same witnesses, and the right may be denied where the interests of the codefendants are identical."

It is obvious that an area is involved that does not lend itself to the establishment of a rigid rule. The university and the church had a mutuality of purpose with the one goal of proving that decedent had a testamentary capacity. Their interests were one and the same, and they would either profit or not together. What if each of the other named legatees had employed counsel? Would fairness, or even the statute itself, demand that the testimony of each adverse witness be subjected to cross-examination by each and every participant even where repitition would become unbearable? We think not. An orderly and fair trial does not dictate such an absurd result. From the record presented, it appears that the trial court acted properly within the rules of law noted. It was a discretionary ruling which not only allowed for an orderly trial but was conditioned to avoid prejudice to either appellant. In this connection, it is of interest that throughout the trial counsel for neither party requested a separate or additional examination of any witness. On appeal, no suggestion is made that some matter favorable to either was not brought out; and, absent a claim of prejudice or

abuse of discretion by the trial court, the point is without merit.

Finding no error, the judgment is affirmed.

HENLEY and DONNELLY, JJ., and O'LEARY, Special Judge, concur.