GRAHAM *v.* THOMPSON *et al.*

*(Nashville,* December Term, 1938.)

Opinion filed March 4, 1939.

FARMER, DENNY & LEFTWICH, of Nashville, for appellant.

SHRIVER & SHRIVER and WALTER S. WALKER, all of Nashville, for appellee.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This is an inquisition of lunacy, brought in the Chancery Court, against Ella Thompson, a colored woman of about eighty years of age, the object of the proceeding being to have a guardian appointed in order to prevent the loss to her of an estate which she had accumulated, valued at something more than fifteen thousand dollars and consisting of real estate, and certificates of deposit in the American National Bank, and some stocks.

The hearing was had in February, 1938, before a jury and the clerk and master, which resulted in a finding that Ella Thompson was not of unsound mind. The matter was brought before the chancellor on a motion to set aside this finding of the jury and order a new hearing. This motion was granted, and on the second trial, which occurred a few weeks later, the jury reported that Ella Thompson was of unsound mind. This finding having been reported to the chancellor, he considered and overruled a motion for a new trial and confirmed by his decree the action of the jury and clerk and master, and he thereupon appointed a guardian in the person of Emma Davis, who was the adopted daugher of Ella Thompson. An appeal was thereupon taken to the Court of Appeals and that court, in an opinion by Judge Portrum of the East Tennessee Division, reversed the decree of the chancellor and dismissed the proceeding. This Court has granted *certiorari* and argument has been heard.

There is much in the opinion of the Court of Appeals

and in the briefs of counsel which we do not regard as material to the determinative issue presented in this case, which is whether or not Ella Thompson is of unsound mind in a sense and to such an extent as that she is incapable of handling and caring for her property.

The learned Court of Appeals held that Willie Graham, who had filed the petition which instituted the proceeding, was without authority in law to appear in this capacity and prosecute the proceeding, in that he failed to come within that class of persons authorized so to act. Upon this ground, the Court of Appeals held that the Chancery Court had acquired no jurisdiction, and reversed the chancellor and dismissed the cause.

It is true that the Court of Appeals proceeded briefly to comment on what it conceived to be other irregularities with respect to the details of the proceedings had below; also the Court briefly comments on the evidence and announces its opinion, without a discussion of the evidence, that there is no evidence sustaining the finding of the jury as to the mental condition of Ella Thompson. However, as we understand the opinion of the Court of Appeals, it treats as determinative the point hereinbefore mentioned and dismisses the suit on the ground that petitioner Graham was without lawful authority to file this petition. With this holding of the Court of Appeals we find ourselves unable to agree.

It appears from the petition and the evidence that Graham is a nephew of the deceased husband of Ella Thompson, and that up to the time of the death of this husband, Graham had been much of the time a companion of Thompson, being called on by Thompson to accompany him from place to place as he grew old and feeble, and to more or less extent wait on him. We think it in-

ferable that their relations were to some extent intimate and that Thompson had confidence in Graham. Thompson had died a few weeks before the institution of these proceedings. There is no suggestion in the record that the relations between Graham and his aunt by marriage, Ella Thompson, had ever been other than harmonious and agreeable.

Our statute providing for proceedings of this nature to be brought in the Chancery Court contains no specification as to by whom the petition therein provided for is to be filed. The statute touching this matter provides that "upon information made to the county court," etc., the court shall take steps to institute the proceeding (Code, section 9614). The language of Code, section 9622, referring to applications to the Chancery Court, reads as follows: "The application to the chancery court shall be by petition, verified by affidavit, setting forth the facts in regard to the person and property," etc. It thus appears that there is no restriction or limitation placed by the statute upon the right to institute this proceeding. Looking to the text books and other authorities, we note first that Mr. Gibson, in his work, generally regarded as high authority on Chancery practice in Tennessee, in section 981, says that, "whenever a person of unsound mind has an estate in excess of five hundred dollars, and no regular guardian, *any person* may file a sworn petition in the Chancery Court," etc. We have italicized the pertinent words "any person." Gibson cites in his note 2 Barb. Ch. Prac. 228, recognized as a learned and exhaustive treatise on the subject, and turning to this authority we find that it is expressly stated that the petition may be presented, not only by a husband or father or mother or brothers, sisters, uncles and other

kin, but by creditors or parties in other business association or relationship with the alleged insane person, and then it is said: "And even strangers may obtain it; and that too in opposition to the members of the family;" which happens to be the identical situation presented by this record, so far as the opposition is concerned.

■■ And, turning to 14 Ruling Case Law, page 557, we find this statement of this rule of practice, which seems to us sound in principle and reasoning:

"While in the majority of cases the proceeding is instituted upon the initiative of a member of the family of the lunatic, yet it frequently happens that it is set in motion by some friend or acquaintance of the lunatic, or even by a law officer of the State, and that with which the courts are mainly concerned is not who institutes the proceeding, but whether it is for the best interest of the individual alleged to be a lunatic and of the people among whom he lives."

It will be observed that the principle suggested is that the courts are not so much concerned with by whom the proceeding is brought, the best interests of the incompetent being the primary consideration.

■ Again in 32 Corpus Juris, page 654, the rule is thus stated: "The persons who may apply for guardianship are usually designated by statute, and include relatives and friends;" it thus appearing that there is no general public policy which excludes those who are not next of kin or not directly interested in the estate from initiating these proceedings.

■ We observe this quotation in the brief of counsel for the respondent in this Court: "As a rule, the application should be presented by a relative or a friend

of the alleged lunatic,'' etc. We are satisfied that this petitioner in this case may qualify either as a relative or friend. We have already indicated circumstances which we think justify the inference that he was among the friends of this family. The term ''relative'' does not necessarily connote blood kinship. Webster defines the word as ''a person connected with another by blood or affinity;'' and ''affinity'' includes ''relation'' and particularly ''relationship by marriage between a husband and his wife's blood relations, or between a wife and her husband's blood relations.'' In his petition filed in this cause, the allegation with respect to petitioner's connection with the defendant, Ella Thompson, is that, ''Petitioner is advised and believes that said Ella Thompson has no living relatives except Your Petitioner, who is the nephew of West Thompson, the deceased husband of Ella Thompson.'' According to the authority already cited, the petitioner was a relative in addition to being what might be termed a friend.

█ It is also to be observed in this connection that while the statute under which this proceeding was evidently brought in the Chancery Court is not explicit on this subject, the companion and subsequently enacted law of 1919 expressly provides that the inquisition may be instituted by ''any person.'' The pertinent provision is found in Code, section 4452, and reads: ''If any person suspect another of being insane, he may make complaint under oath to the clerk of the county court,'' etc. We think it thus fairly appears that the Legislature of Tennessee does not hold to the view that public policy requires such a limitation upon the right to put in motion this character of proceeding as the holding of the learned Court of Appeals would appear to prescribe.

286

While it is true that the statutory provisions in force in other jurisdictions are not determinative, they do have a bearing upon the question of public policy and also upon the soundness of general rules relating to this question of who may properly institute proceedings of this character, and it may be remarked that many of the statutory provisions provide that the proceedings may be instituted by "any friend or relative." For example, in the case of *Shumway* v. *Shumway*, decided more than one hundred years ago 2 Vt., 339, we find the Vermont statute, in force in 1829, quoted as reading as follows: "On the request of any friend or relation" such proceedings may be brought.

Much has been injected into the record touching the character of Graham, the petitioner, and his motives, and, on the other hand, reflecting upon the character of Emma Davis, an adopted daughter of Ella Thompson. We do not consider it material to the determination of the issue in this case to consider these matters. We think this record shows that this family of Thompsons are colored people of unusually good standing, education and property. They seem to belong to the school teacher class. The initiation of this proceeding was probably brought about by the presentation to the bank of a five hundred dollar check by Emma Davis, which the bank declined to pay, being impressed that there had been some manipulation or change in the figures. The record indicates that Emma Davis was authorized to present and cash this check, but the record does not wholly explain just what and how it was to be used for the benefit of Ella Thompson, the explanation in a general way was being given that a recreational trip was contemplated

for the benefit of Ella Thompson. However, as before suggested, all these matters are really immaterial.

What has been heretofore said disposes of this case on the question held by the Court of Appeals to be determinative and made the basis of its reversal decree.

We have examined the record with care in an effort to arrive at the merits. In the first place, it must be borne in mind that we have here a finding of a jury, reported with approval by the clerk and master to the chancellor, who upon review of the evidence concurred with and approved this finding to the effect that Ella Thompson was of unsound mind to the degree contemplated by the law. Without giving to this jury finding the effect commonly accorded to the finding of a jury in passing upon the facts, that is, that if the finding is supported by material evidence it will not be disturbed; and without applying the rule applicable to cases in which there has been a reference to the master, with his report concurred in by the chancellor, we have examined the record to ascertain whether or not there is a preponderance of proof supporting the decree of the chancellor. Conceding that there is testimony both ways, we are satisfied to affirm the decree of the chancellor on the facts proven.

It is argued that on the first hearing a jury found Ella Thompson not to be of unsound mind and that the chancellor should not have interfered with that finding, but should have approved it. It is significant in this connection that the record shows that Ella Thompson was not brought before the jury and personally examined on the first hearing, and we think it altogether likely that this circumstance of omission had weight with the chancellor. Code, section 9628 expressly provides that, "the jury shall hear the testimony offered, and inspect

and examine the defendant himself, in making a verdict." There is thus an express statutory direction that the defendant shall be brought before the jury and there inspected and examined. Upon the second hearing this statutory requirement was complied with, and it is fair to assume that the jury based its conclusion in material part upon this personal examination and inspection. An appellate court cannot have the advantage thus afforded the jury and trial officer who presided over the deliberations of the jury, and there is perhaps no circumstance more fairly calculated to afford an opportunity to form an opinion in a case of this character.

 Not only is there definite testimony by several apparently qualified and disinterested expert medical witnesses to the effect that Ella Thompson is not competent mentally to handle her financial affairs, but it developed on her own examination, for example, that while the case was heard in March, she thought it was the month of December, and that while it was heard in the year 1938, she thought it was the year 1944. Now conceding that lapses of memory are natural in persons of her age, and that proof of such lapses of memory are not conclusive, these are such extreme illustrations of mental deficiency that they may be properly considered as exceedingly persuasive. Moreover, a careful examination of her demonstrated that while she had certificates of deposit aggregating some six or seven thousand dollars in the American National Bank, she was utterly unable to give any reasonable estimate of what amount of funds she had in the bank, or in what character she had her investments in the bank. Her estimate was approximately a thousand dollars. Whatever may have been her general mental condition or capabilities, it seems

to us that nothing could more conclusively indicate that she was not in mental condition to handle her financial affairs.

A circumstance developed in the proof, which seems to us exceedingly material, arose in connection with the testimony given by a bank official who interviewed Ella Thompson with regard to the check to which reference has heretofore been made. In this connection, it developed that previous to the execution of this check, and since the death of her husband, Ella Thompson had executed a power of attorney to her adopted daughter, Emma Davis. And yet, when discussing this check with the bank official, who naturally took the position that by virtue of this power of attorney Emma Davis could draw on the funds in bank in the name of Ella Thompson, the old woman protested that she did not want Emma Davis to draw on her bank account, but that all checks were to be signed by her personally. Now, obviously, this was wholly inconsistent with the power of attorney which she had executed to Emma Davis. We think it demonstrates clearly that she did not know what would be the effect of her execution of this general power of attorney. This goes directly to the question of her capacity to handle her business and financial affairs. Under just what circumstances she executed or was induced to execute the power of attorney, does not clearly appear, but, manifestly, she did not intend to do what she had done by an instrument which affected most vitally all of her property interests. As already indicated, we find no satisfactory reason for reversing the decree of the chancellor on the facts.

Moreover, on the whole case, we do not find that the appointment made in this case is calculated to affect

adversely the interests of the parties involved. As before stated, Emma Davis is the adopted daughter of Ella Thompson. According to the proof in the record, she is the sole heir of the estate of Ella Thompson upon her death without will. Now the chancellor appointed as the guardian of Ella Thompson this adopted daughter, Emma Davis, requiring her to give a bond proportioned to the value of the estate. It is true that the proceeding involves cost and attorneys' fees, and much complaint is made of this, but we know of no way to avoid this incidental expense, if the proceeding has been properly brought and the finding of the jury sustained by the chancellor is to be approved.

It results that the decree of the Court of Appeals must be reversed and that of the chancellor affirmed. The cause is remanded to the Chancery Court docket for such other and further proceedings and orders as may be proper following this affirmance, including adjudication of costs, fees, and other charges against the estate, the cause to be retained on said docket pending the making of guardianship reports and settlements, etc., in the future.