MATTIE B. ADAMS, DORA McKINLEY and GRACE FULMER, Appellants, v. CORNELIA SIMPSON, FANNIE SAVILLE, IDA SEARLES, ALMA SIMPSON, CHESTER SIMPSON, JESS ANDREWS, JOHN ANDREWS, JR., JOHN ANDREWS, JR., EXECUTOR OF THE ESTATE OF ELLSWORTH W. SALMON, DECEASED, MOUNT VERNON CEMETERY, a voluntary association and THE GRANT CITY CEMETERY, a Corporation, Respondents.—No. 40785.—213 S. W. (2d) 908.

Division One, September 13, 1948.

Rehearing Denied, October 11, 1948.

*Ellis Beavers* and *J. Dorr Ewing* for appellants.

*Bert Miller, C. B. DuBois,* and *L. L. Livengood* for respondents.

[909] CONKLING, J.—This action sought to set aside the last will of Ellsworth W. Salmon, deceased, on the ground of testa- mentary incapacity. At the close of all the evidence the trial court sustained proponents' motion for a directed verdict that the writing in evidence was the will of the deceased. The contestants appealed. For reasons hereinafter stated, upon the record here we sustain the trial court's ruling and affirm its judgment.

Testator, 81 years of age, had farmed in Worth County and there fed and marketed stock most of his adult life. In later years he rented his farm and moved to Grant City. There he operated a feed and seed business. Later he sold that business, but resided in Grant City until his death. His wife had died on November 24, 1946. They had no children. He prepared his own typewritten will, properly executed it and had it signed and witnessed in his home on December 16, 1946. He died in August, 1947.

Testator was a successful farmer and business man. He drew his own farm leases. Shortly before his wife's death he contracted to sell his farm for a good price, and personally closed that deal and executed a deed on January 18, 1947. Shortly before and shortly after the date of the execution of the will he did many things re- quiring a sound mind and business acumen. While always a poor speller, testator was shrewd, careful, thrifty, intelligent and success- ful. He sometimes casually counselled with attorneys, but like many other people, it was often upon a gratuity basis. Just before the occasion of preparing his will he consulted Mr. Hastings, an attor- ney, secured from him directions as to the formal requirements of a will, but instead of employing an attorney to do so, testator prepared and typed the instant will himself.

The will was as follows: "Grant City, MO, December 16- 1946. I—Elsworth W. Salmon being of sound mind and memory, do makepublish and declar this to be my last will and testament to wit; Fist—All my just debts and funeral expenses shall be first fully paid, Second I give, devise and bequeate all of onehundred dolars to the Mount Vernen Cemertry, also Onehundred dolars to the Grant City, Cemeraty for up keep, Third— I my self want to have the same kind of Furnal as I had for my wife the same kind of Casket and Vault— and be laid a way by the side of my wife in the Grant City Cemertry, Third— The balance of my Money and property where so ever be— I wanted to be equal divided a mong my Friens and relation —Two

Sisters—about Ten Neics and Nefues— I do not know where all of them are. Some in St-Joseph.Mo. and Some In Blockton, Iowa. One In Readding, Iowa. One In Chicago, ILL.

Forth— I want John Andrews.Juner and his fother to have the Sume of Five hundred dolars for ther work taking cair of me and my wife Saretta.

Juner.

Fifth— I —Nominate and appoint John Andrews to be my executor of this my last will and testament, hereby revoking all former wills by me;

E. W. Salmon

Witnesses

Owen K. Lambert

Kenton E. Thompson"

About 1938 testator suffered a slight paralytic stroke from which he had fully recovered. In November and December, [910] 1946 he had some arteriosclerosis and high blood pressure which on occasions caused him to be a "little confused" and forgetful. He also had some vertigo and prostate gland complications. Those conditions were not unusual for one of his age. He was somewhat eccentric and peculiar.

On December 18, 1946, alone and unaccompanied, testator went to St. Joseph, Missouri and secured a room at the St. Francis Hotel. He there wrote the following letter to his niece, the contestant Mattie B. Adams, who lived in St. Joseph: "St. Joseph, Mo.

Dec 18, 1946

Mrs. Mattie B. Adams

St. Joe. Mo—

Dear Niece

I am down in St. Joe. but I cant tell just wher I will be in a few days—probly in the hospitile I have bin prety sick for 3 or 4 days—and will half to have an operation I gess—my hy blud preshur—has mad me have bad spells with my hart—and *mind*—I cant remember where I am at—and I cant hardly write In otherwords—I am not at my Self—I will see Dr GreenBurg—tomorrow—also Dr Caral—I wish I could meet you some Hotell Say the Fransas—I will be glad to see you any old time—I do not know how long I will half to stay in St Joe probly 10 days or longer—call at the St. FrancesThat will be my headquarters I am not very stout—but I would like to see you before I go to the hospitell

Yours Truly

I am so nurvis                    E. W. Salmon"

Later that day he had Mrs. Adams called by telephone and she came to the hotel. Testator then placed himself under the care of a physician, and entered a hospital for examination by Doctor Carle. He remained there two days. That examination disclosed that he

had a generalized arteriosclerosis, high blood pressure, enlarged prostate, some retention of urine, and his heart was diseased but "still able to do its job in keeping with the energy demands on his heart"; that he was of ordinary understanding and capable of transacting the ordinary affairs of life; and that he was mentally oriented and had no symptoms of dementia.

On December 20, 1946, he paid his bill at the hospital and returned alone to the St. Francis Hotel in St. Joseph, remaining there alone until January 7, 1947. He was not confined to his bed but was around every day normally visiting with other people. Between December 20, 1946 and January 7, 1947, when he returned alone to Grant City, testator visited often with Mrs. Adams and spent Christmas and New Year's Day in her home.

It was Doctor Fullerton's opinion that on December 4 or 5, 1946, testator was of sound mind, and through December 16, 1946, that physician observed no change in testator's physical or mental condition. Doctor Matteson who prescribed for testator through November and part of December, 1946, and saw him on December 15 or 16, 1946, testified: "I believe he was of sound mind". Doctor Carle, of St. Joseph, Missouri, who examined testator in the St. Joseph's Hospital testified testator was not of unsound mind on December 18 to 20, but he could not answer either "yes" or "no" as to testator's mentality on December 16, but stated that testator, when the will was written, "was not certainly in as sound a mind as he had been at other times and would not be as logical as I found him to be at the time I examined him". Doctor Ross, who had not seen testator professionally, declined to express an opinion.

The only direct evidence in the record upon testamentary capacity *at the time of the execution of the will* clearly shows testator had such testamentary capacity. This is abundantly established by the testimony of the witnesses to the will who executed it as such in testator's presence. There is no direct evidence even tending to the contrary. But this appeal raises the question of whether this entire record nevertheless affords any substantial evidence or raises any reasonable inference of testamentary incapacity sufficient to require submission of that issue to the jury. Upon consideration of this question we must and do grant contestants' every reasonable inference which may support their contention, but "forced and violent inferences" we cannot allow. Turner v. Anderson, 260 Mo. 1, 168 S. W. 943; Schoenhoff [911] v. Haering, 327 Mo. 837, 38 S. W. (2d) 1011, 1014; Walter v. Alt, 348 Mo. 53, 152 S. W. (2d) 135.

In this state a testator has testamentary capacity when he has mind enough to understand the ordinary affairs of life, the nature and extent of his property, who comprise the objects of his bounty, and the fact that by the instrument he is executing he is giving his property to the persons or class of persons he names in his will,

in the manner in which that instrument recites. Morrow v. Board of Trustees of Park College, 353 Mo. 21, 181 S. W. (2d) 945; Rex v. Masonic Home, 341 Mo. 589, 108 S. W. (2d) 72, 85, and see also 57 Amer. Juris. Secs. 1262, 1268.

We have considered cases where "extreme old age, with its attendant physical and intellectual weaknesses" (Hennings v. Hallar, 347 Mo. 827, 149 S. W. (2d) 338), where testator was 82 years of age and in "extreme illness" and disease (Lindsey v. Stephens, 229 Mo. 600, 129 S. W. 641; Pickett v. Cooper, 354 Mo. 910, 192 S. W. (2d) 412), where testator had kidney and prostate complications, and was even at the point of death from cancer (Wood v. Carpenter, 166 Mo. 465, 66 S. W. 172; Whitacre v. Kelly, 345 Mo. 489, 134 S. W. (2d) 121) where testator "became on occasion momentarily confused", or had arteriosclerosis (Rex v. Masonic Home, supra; Walter v. Alt, supra), where testator was old, nervous and eccentric (Morrow v. Board of Trustees of Park College, supra; Proffer v. Proffer, 342 Mo. 184, 114 S. W. (2d) 1035), where testator had "imperfect memory resulting from sickness or old age, and forgetfulness of names of persons" (Berkemeier v. Reller, (Mo. Sup.) 37 S. W. (2d) 430). Those cases cite many others of like character.

Each testator in each of the just above named cases had other complicating physical and mental conditions. But neither those conditions, singly or in combination, nor any condition of testator here gives rise to an inference of mental incapacity to make a will if testator is able to transact ordinary business, understands the extent of his property and how he is disposing of it and knows the natural objects of his bounty. Nute v. Fry, 341 Mo. 1138, 111 S. W. (2d) 84. See also, Ahmann v. Elmore, (Mo. Sup.) 211 S. W. (2d) 480.

While evidence of physical and mental condition both before and after the execution of the will is admissible, such evidence lacks probative value upon the issue here unless it raises a reasonable inference as to mental condition at the time of the signing of the will. Proffer v. Proffer, supra; Schoenhoff v. Haering, supra; Whitacre v. Kelly, supra. But no testimony in this record as to any condition of testator either before or after December 16, raises any reasonable inference that at the time the will was executed testator lacked testamentary capacity.

Contestants urge that testator's letter to his niece of December 18 raises such inference. We cannot agree with that contention. His statement that he had been "prety sick for 3 or 4 days" and his recitation in that letter of his symptoms, considered with the other evidence of his condition, raises no such inference. From his statement on December 18 "I cant remember where I am at—. . . . I am not at myself", if such was true, it cannot reasonably

be inferred that testator lacked testamentary capacity on December 16. But from the fact that in the letter itself he later stated he was at the St. Francis Hotel it is plain testator did know where he was. While some persons could write better letters, nothing in testator's letter, quoted supra, raises the slightest inference which would make a jury issue.

We come now to contestants' main contention, that the will itself is sufficient to raise a reasonable inference of lack of testamentary capacity. It is specifically urged that (1) we consider the testator's signature, the appearance and text, the form and language, the spelling and spacing of the will, (2) two separate provisions are designated "Third", (3) testator's nieces and nephews are numerically designated at "about ten" when it is agreed that, in fact, such class at the time of the execution of the will numbered only six, and that (4) the word "friens" (friends) was used by testator to signify a separate, [912] unnamed class of beneficiaries impossible of either numeration or identification, and he therefore did not know to whom he was giving his property.

We believe that the appearance of this will tends to prove testamentary capacity (Re Arnold's Estate, 16 Cal. (2d) 573, 107 Pac. (2d) 25). The original will, filed here, is on a plain sheet of white paper neatly typewritten, clean, with no erasures and only two typographical errors. From our examination of testator's signature on the original will, and a comparison thereof with his admitted signatures on the many checks, letters and other exhibits filed here, all antedating the will, some by many years, we find the signature on the will equally good with the others. A normal signature certainly tends to disprove mental and physical weakness. Keen's Estate, 299 Pa. 430, 149 Atl. 737; 57 Amer. Juris., Wills, Sec. 107. In the original will the second "Third" paragraph is double spaced. The other paragraphs are single spaced. But when testator's background and his lack of experience in typing and in the preparation of such instruments is considered neither the spacing nor the spelling raises any inference of mental incompetency. Testator was always a notoriously poor speller. That failing is today common to many persons.

It is not of consequence that two separate paragraphs are designated "Third". Such errors are not unusual and testamentary incapacity cannot be inferred therefrom when considered alone or in conjunction with the other matters to which our attention is directed.

As to the inaccurate enumeration of testator's six nieces and nephews. They are described in the will as "about Ten Neics and Nefues". Can any reasonable inference of testamentary incapacity be drawn from the fact that testator did not know exactly how many persons fell into the niece and nephew class, or from the fact that

he did not know the exact address of each? We think those facts given rise to no such inference.

Testator knew he had two sisters, and designated them. He knew he had nieces and nephews, and designated them. He named his sisters and his nieces and nephews as the class to receive his estate. The will itself shows he knew to whom he was giving his property and the estate he was giving to each member of the class created. He knew who his relatives were. All were beneficiaries under his will. Failing to remember the number and addresses of nieces and nephews is not an uncommon weakness of men much younger and in the prime and vigor of active mental life.

█ Testator placed his two sisters in a class with his nieces and nephews and left that entire class the whole of his residuary. Considered with the context, the testator's obvious intention confirms that he was considering the eight as a class. From the general scope of the will, the general purpose of testator, the language of the residuary clause, the relationship of the parties, the provision for equal division and the circumstances surrounding the entire transaction it is inescapable that testator intended to create that class. His groupmindedness is apparent. The nieces and nephews have common attributes, and sustain to testator the same relation. The language of the residuary clause and of the entire will forecloses any other conclusion. Holloway v. Burke, 336 Mo. 380, 79 S. W. (2d) 104; First Trust Company v. Myers, 351 Mo. 899, 174 S. W. (2d) 378; Walker v. First Trust & Savings Bank, 12 Fed. (2d) 896. See annotations, 75 A. L. R. 757; 105 A. L. R. 1394; 2 Schouler on Wills, Secs. 1011, 1012; 3 Page on Wills, Sec. 1074.

The reasoning which has been applied by the courts in cases of erroneous enumeration of members of a class seems based upon the principle of prevention of intestacy for any such mistake. It here appears to have been the dominant intention of testator to benefit, equally with his sisters, the entire class of his nieces and nephews. Other than his two sisters and the six nephews and nieces testator then had no other family or relatives. Those who actually and in truth fell within the class are deemed to have been intended and the enumeration stated by the testator must be disregarded. 57 Amer. Juris., Wills, Sec. 1268; 15 Am. & Eng. Ann. Cases 45, 46; Todd v. Gambrill, 138 Atl. (Del.) 167. [913] In the Todd case the court, in ruling a situation where testator failed to correctly state the number of his wife's "nephews and nieces" whom he put into a class with his sister and others, the court quoted from 28 R. C. L. as follows: " 'When a governing intention to benefit the children of a certain person appears from a will, coupled with a mistake in the number of those children, the dominant intention to benefit the persons so described must be given effect by rejecting the inaccurate enumeration' ".

We hold that from neither the fact that testator created such a class in his will, nor from the fact that he made an inaccurate enumeration of his "neices and nefues" can there arise any possible inference of testamentary incapacity.

We do not agree with appellants' last contention that by the words in the residuary clause, "Friens and relation—Two Sisters—about Ten Neics and Nefues", testator sought to create a separate and additional unknown class of beneficiaries impossible of enumeration or identification, or that the use of the last above quoted words raises any inference of testamentary incapacity.

We have said of wills: "Of all written instruments, wills are the least formal. Anything written, in any form, goes for a will, if it reveals the intention of the maker to dispose of his property at death. . . . the intention of the testator is the guiding principle; . . . his blood relatives, his heirs, are favorites of the law and entitled to first consideration in doubtful expressions", etc. Coleman v. Haworth, 320 Mo. 852; 8 S. W. (2d) 931; Grundmann v. Wilde, 346 Mo. 327, 141 S. W. (2d) 778.

It is apparent that testator intended to spell out "friends and relations". The question to be here determined is whether the use of the words (friends and relations) actually created a different class impossible of identification, and that because thereof testator did not know or indicate to whom he was actually leaving his property, or whether those words are used in a restricted sense as descriptive of the class, his sisters, nieces and nephews.

If the instant will had provided that testator's property should go only to "such as are my friends", or "to friends to be selected and chosen by my executor", or to "whoever has been his best friend", such a bequest clearly would have been void for lack of certainty of beneficiaries, and there would then be some force to contestants' argument. Kepley v. Caldwell, 148 N. W. (Neb.) 966; Clark v. Campbell, 82 N. H. 281, 133 Atl. 166, 45 A. L. R. 1433; Early v. Arnold, 89 S. E. (Va.) 900. But those are not the provisions of the instant will. We here have no such situation.

"Friend" is a descriptive word of broad and varied application. A man's wife "may properly be regarded as his friend". Davis v. Merrill, 47 N. H. 208, 210. Neither the law nor truth and fact should exclude her from that descriptive classification. In Ned v. Robinson, 181 Okl. 507, 74 Pac. (2d) 1156, 1158, it was said: "It (friend) is commonly used to describe the indefinable relationships which exist, *not only between those connected by ties of kinship or marriage*, but as well between strangers in blood, and which vary in degree from the greatest intimacy to an acquaintance more or less casual." (Emphasis ours.) A nephew has been held to be both a friend and a relative. Graham v. Thompson, 174 Tenn. 278, 125 S. W. (2d) 133, 135. Nieces and nephews are relatives of testator.

Snow v. Ferril, 320 Mo. 543, 8 S. W. (2d) 1008, 1017. They can as well be also friends. This record tends to confirm that they were. "Relatives" of a testator include sisters, they being such by consanguinity. In re Knighten's Estate, 344 Mo. 246, 125 S. W. (2d) 863, In re Buell's Estate, 167 Or. 295, 117 Pac. (2d) 832. This record confirms also testator's sisters were in fact his friends. The term "relative" or "relatives" is usually held to apply to those who are of one's own blood and would take by virtue of the statute of distributions. Rauch v. Metz, 212 S. W. 353 (Mo. Sup.).

It is apparent from all the facts and circumstances of record, and from the will and its context, and we so hold, that the words (friends and relations) in this residuary clause, preceding as they do the [914] naming of the class, were not used in the instant will in a disposing sense at all, but were used as limiting in nature and merely descriptive of testator's sisters, nieces and nephews.

We find nothing within the four corners of the record before us which raises any inference of testamentary incapacity at the time of the execution of the will. The judgment appealed from must be affirmed. It is so ordered. All concur.