Charles Michael LEHR and Johanna
Sue Chelgren, Appellants,

v.

Marilynn Mae COLLIER and Meredythe
(Peggy) Mae Arnold, Co–Personal Rep-
resentatives of the Estate of Julia E.
Lehr, deceased, and Co–Trustees of the
Julia E. Lehr Revocable Living Trust
dated January 3, 1984, Respondents.

No. 19905.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 28, 1995.

Motion for Rehearing or Transfer
Denied Oct. 20, 1995.

Gary D. Rappard, Kansas City, for appellant.

Richard D. Bender, Sherwood, Honecker & Bender, Springfield, for respondents.

SHRUM, Chief Judge.

Acting jointly, Charles Michael Lehr and Johanna Sue Chelgren [1] filed two petitions in their deceased grandmother's probate estate (Estate of Julia E. Lehr). By petition "A" they sought an order to remove Marilynn Mae Collier (Marilynn) and Meredythe Mae (Peggy) Arnold as co-personal representatives of Julia's estate.[2] By petition "B," they asked that Marilynn and Peggy be removed as co-trustees of Julia's inter vivos trust.[3]

The trial court dismissed petition "A" at the end of Petitioners' presentation of evidence. The court found that Petitioners were not devisees or legatees under Julia's will and, on that basis, ruled that Petitioners lacked standing to request removal of the personal representatives.

Regarding petition "B," the trial court dismissed it upon Respondents' motion filed at the conclusion of the case. The trial court relied upon extrinsic evidence that came in without objection, to conclude that Julia did not intend her grandson, Mike, to share in her estate. As to Sue, the trial court noted that it could not explain why Julia excluded her as a beneficiary of the trust "except that the overall treatment of grandchildren seemed to be consistent throughout the will and trust documents." Based on those findings, the trial court ruled that "Petitioners are not beneficiaries under the ... Trust

---

1. Without intending disrespect, herein we refer to Charles Michael Lehr as "Mike," and Johanna Sue Chelgren as "Sue." Collectively, we refer to them as "Petitioners."

2. Again, without intending disrespect, we refer to Petitioners' late grandmother, Julia Lehr, as "Ju-lia." We refer to Marilynn Mae Collier and Meredythe (Peggy) Mae Arnold individually as "Marilynn" and "Peggy." Collectively, we refer to them as "Respondents."

3. We have designated the petitions as "A" and "B" for the sake of brevity and ease of reference.

Agreement ... and, therefore, lack standing to request removal of the co-trustees."

Petitioners appeal from the orders dismissing petitions "A" and "B."

Under the applicable standard of review, we must affirm the judgment if it is supported by substantial evidence, if it is not against the weight of the evidence, and if it is not based on an erroneous declaration or application of law. *Schupbach v. Schupbach,* 760 S.W.2d 918, 920 (Mo.App.1988) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo. banc 1976)).

We find that the trial court misapplied or erroneously declared the law in dismissing petitions "A" and "B." We reverse and remand.

## FACTS

On January 3, 1984, Julia executed a will and an inter vivos trust prepared by her lawyer.

The diagram below lists Julia's children, living and dead, as of January 3, 1984. Also, it lists Petitioners—but not other grandchildren—because Petitioners were the only descendants of Julia's two deceased children.

Julia Lehr
(Testator and Trust Grantor)

(Children of Julia Lehr)

| Eddie Lehr (deceased in 1950s. No children) | Frankie Lehr | Charles Lawrence Lehr, Jr. (deceased 1976) | Meredythe Arnold (co-trustee/ co-personal representative/ Respondent) | Marilynn Collier (co-trustee/ co-personal representative/ Respondent) |
|---|---|---|---|---|

(Children of Charles Lehr, Jr.)

Johanna Sue (Lehr) Chelgren
(Petitioner)

Charles Michael "Mike" Lehr
(Petitioner)

---

Julia died on July 26, 1993. Petitioners, Respondents, and Frankie survived Julia.

In her will, Julia declared that she was single and "I have three ... children, namely, [PEGGY],[4] FRANKIE ... and MARILYNN...." She made no mention of deceased children in her will nor did she mention grandchildren, either by name or as a class. In Article III, Julia devised and bequeathed "all of my tangible personal property to my three (3) children, [PEGGY], FRANKIE ... and MARILYNN...." She defined "tangible personal property" as "automobiles, jewelry, collections, clothing, purely personal effects, chinaware, silverware, books, pictures, antiques, paintings, furniture and household goods, and furnishings of every kind and description, and including any

insurance thereon." Article IV of Julia's will contained a pour-over provision which funded her contemporaneously-created inter vivos trust with the residuary estate. Article V named Peggy and Marilynn as co-personal representatives.

As to Julia's trust instrument (exhibit 9), in pertinent part it read:

*"ARTICLE I*

. . . .

C. After the death of the Grantor, and after the payment of ... obligations [as described] ..., the successor Co–Trustees shall then *divide* all of the rest, residue and remainder of *the trust estate* into such number of equal shares so as *to provide for one equal share for the descendants, collec-*

---

4. In the January 4, 1984, instruments, Peggy's name appears as "Meredythe (Peggy) Mae Heckendorn." An amendment to Julia's trust on Jan-

uary 14, 1986, reads: "The said Meredythe Mae Heckendorn and the said Meredythe M. Arnold are one and the same person."

*tively, of each of the Grantor's children who may then be deceased,* which shares shall be divided per stirpes and not per capita. The successor Co–Trustees shall then ... pay over and distribute the same in the following manner:

> 1. *In the event that a share is set aside for the benefit of [Peggy],* the Co–Trustees shall pay over and distribute, said share of trust to ... [Peggy], and the trust estate shall thereupon terminate with respect to said share.
>
> 2. *In the event that a share ... is set aside for the benefit of Frankie ...,* the Co–Trustees shall pay over and distribute, said share of trust to the said Frankie ..., and the trust estate shall thereupon terminate with respect to said share.
>
> 3. *In the event that a share ... is set aside for the benefit of Marilynn ...,* the Co–Trustees shall pay over and distribute, said share of trust to the said ... [Marilynn], and the trust estate shall thereupon terminate with respect to said share.
>
> 4. Notwithstanding anything to the contrary herein contained [sic] in the event that any share ... shall be distributed to any beneficiary who has not as yet attained ... majority ..., the Co–Trustees shall nevertheless continue to retain said share of trust and shall pay such portion of the principal and/or income therefrom to or for the benefit of such beneficiary for the support, maintenance, education and medical care of said beneficiary.... *At such time that each beneficiary attains the age of majority ... the Co–Trustees shall pay over and distribute, free of trust, said share to such beneficiary, and the trust estate shall thereupon terminate with respect to said share."* (Emphasis ours.)

In petition "B," Petitioners relied upon the emphasized language in paragraph C and its subparagraph 4 to allege that they were the sole beneficiaries of Julia's trust. Continuing, they alleged that after Julia's death, numerous requests by them to Respondents regarding the trust went unanswered. Additionally, they alleged that Respondents breached numerous of their duties as co-trustees. Based on those allegations, Petitioners sought an order removing Respondents as co-trustees as well as other relief.

In his opening statement, Petitioners' lawyer told the trial court that Petitioners would offer evidence about who Julia intended to designate as beneficiaries of her trust. Without expressly conceding that ambiguity existed in Julia's trust, counsel told the court that Mike and Sue's position was that "the inter vivos trust is intended to be split four ways" and that they should receive their father's share.

Petitioners then offered evidence as their lawyer had outlined in his opening statement. Specifically, Mike testified that in 1984, Julia had assured him that he and Sue would receive their father's share of the trust estate. Witnesses Frank and Eva Pezza testified about conversations with Julia in which Julia stated that Mike and Sue would get their father's share of her estate through her will or trust. Additionally, Petitioners placed in evidence a draft copy of Julia's trust (exhibit 10). It contained additional language in Article I, paragraph C that was not in the trust instrument Julia signed. The pertinent part of exhibit 10 with the additional language underlined reads as follows:

> "C. After the death of the Grantor, ... the successor Co–Trustees shall then divide all of the rest, residue and remainder of the trust estate into such number of equal shares so as to provide for one equal share for <u>each child of the Grantor who is then living, and</u> one equal share for the descendants, collectively, of each of the Grantor's children who may then be deceased, which shares shall be divided per stirpes and not per capita. (Emphasis ours.)

Respondents called Catherine Dowling as a witness. Her testimony included the following. She worked for Julia's lawyer when Julia's will and trust were prepared. At the lawyer's direction, Dowling "drew" or "typed out" Julia's will and also the final signed copy of Julia's trust document and a draft copy of the trust. Dowling was never told to alter the language in the final version of Julia's trust instrument from what was in the rough

draft. The omission of the language "each child of the grantor who is then living, and" from exhibit 9 resulted from "an error on [her] part." Dowling testified that she did not have a word processor; hence, her procedure was to type out a draft copy of every instrument. Dowling testified that Julia had stated in her presence that she wanted her children to be "taken care of," there were to be no other beneficiaries, and that she would "not leave [her grandchildren] anything."

Judith Taylor, Respondent Peggy's daughter, also testified about conversations in which Julia stated that the only beneficiaries of her estate would be her children: Marilynn, Peggy, and Frankie; that Mike already had his inheritance; and that Mike and Sue would not receive a share. According to Taylor, Julia made these statements in their private conversations and also on several occasions when Julia talked to her lawyer in Taylor's presence.

In paragraph 9 of its "Findings and Order," the trial court found that Julia's trust contained "a scrivener's error at Article I Paragraph C." Also in paragraph 9, the trial court found that "[a]t trial, counsel and the evidence were in agreement that the correct text is that which appears in the same paragraph of Petitioners' exhibit 10." Based on those findings, the trial court reformed the trust to correct the scrivener's error via this order:

> "It is the order judgment and decree of the Court that the Revocable Living Trust of Julia E. Lehr dated January 3, 1984, is amended at Article I, Paragraph C per the Court's finding in paragraph 9 herein."

Additionally, the trial court observed that evidence in the record supported "the finding that Julia ... intended her grandson ... [Mike] to not share in her estate." The court also found that it was "at a loss to explain why ... Sue ... did not share in the trust estate except that the overall treatment of grandchildren seemed to be consistent throughout the will and trust documents." The trial judge concluded that Petitioners were not beneficiaries under Julia's trust and, therefore, lacked standing to request removal of Respondents as co-trustees. Ac-cordingly, the trial court dismissed petition "B."

## DISCUSSION AND DECISION

By Points II, III and IV, Petitioners present four questions.

First, was Julia's unreformed trust instrument ambiguous? We answer, "Yes."

Second, did the trial court err in reforming the trust document? We answer, "No."

Third, did the reformed trust instrument contain an ambiguity? We answer, "No."

Fourth, did the trial court misapply the law when it used extrinsic evidence to reach the conclusion that Julia did not intend Petitioners to be beneficiaries of her trust? We answer, "Yes."

■ "'Ambiguity' means 'duplicity, indistinctness or uncertainty of meaning of an expression used in a written instrument.'" *Schupbach,* 760 S.W.2d at 923[2]. A trust instrument is ambiguous if its provisions, when taken together, evoke a question as to who the real parties and beneficiaries are. *See In re Estate of Lamy,* 679 S.W.2d 288, 290[2] (Mo. banc 1984).

■ An ambiguity in a trust instrument may be either patent or latent. *Schupbach,* 760 S.W.2d at 923. "A patent ambiguity is one on the face of the instrument, whereas a latent ambiguity occurs where the instrument itself is unambiguous on its face but becomes open to more than one interpretation when applied to the factual situation in issue." *Boatmen's Union National Bank v. Welton,* 640 S.W.2d 497, 502[3] (Mo.App. 1982).

■ A reading of Julia's trust immediately evokes a question about who the real parties and beneficiaries are; hence, it is ambiguous. *See Lamy,* 679 S.W.2d at 290[3]. Specifically, we refer to the conflict between Article I, paragraph C and its subparagraphs 1–3. When read in isolation, paragraph C directs the co-trustees to "divide ... the ... remainder of the trust estate into such number of equal shares so as to provide for one equal share *for the descendants, collectively, of each of [Julia's] children who may then be deceased,* which shares shall be divided per

stirpes and not per capita." As written, paragraph C makes no provision for "an equal share" of the trust estate for Julia's children either by name or as a class, but provides "an equal share" for a different class of beneficiaries, i.e., "descendants ... of each of [Julia's] children who may then be deceased...." Yet, inexplicably, subparagraphs 1–3 of paragraph C provide for contingent distributions of the trust estate to Julia's children, Peggy, Frankie, and Marilynn. The provisions cannot be reconciled and create an ambiguity in the instrument. We reject Petitioners' arguments to the contrary.

■ The problems presented by Julia's trust instrument are patent, that is, they are apparent to a person who reads the entire document with care. *See Marvin F. Hall Trust v. Hall,* 810 S.W.2d 710, 714 (Mo.App. 1991). In such a case, the court must read the instrument " 'as near as may be from [the grantor's] standpoint, giving effect, if possible, to every clause and portion of it, and to this end, if need be, words may be supplied and omitted....' " *Id.* (quoting *Grace v. Perry,* 197 Mo. 550, 95 S.W. 875, 877 (1906)). When a trust instrument contains a patent ambiguity, it is permissible to resort to extrinsic evidence of "objective, operative facts concerning events in the [Grantor's] life ... in order ... to give precise and explicit meaning to the language used in the instrument." *Schupbach,* 760 S.W.2d at 923[4]. However, where the ambiguity is patent, evidence of a grantor's declarations of intent is generally inadmissible, whether made before, at the time of, or after execution. *Hall,* 810 S.W.2d at 715[6] (citing *Breckner v. Prestwood,* 600 S.W.2d 52, 56[5] (Mo.App.1980)).

Disregarding evidence about Julia's declarations of intent, there was substantial evidence via Catherine Dowling's testimony that a circumstance surrounding Julia's trust was a scrivener's error. Contrary to Petitioners' contentions in Points II and III, the trial court did not err when it reformed Julia's trust instrument to add the omitted language. By amending paragraph C of Article I as the trial court did, the conflict between paragraph C and its subparagraphs 1–3 was reconciled. We affirm that part of the trial court's judgment that reformed paragraph C, Article I of Julia's trust.

■ Our conclusion that the trial court correctly reformed Julia's trust instrument does not end our analysis. In their fourth point, Petitioners assert that the trial court erred when it construed the reformed trust as benefiting only "living children" or their descendants, thus eliminating Petitioners as beneficiaries. They contend that whether reformed or not, Julia's trust instrument unambiguously identifies them as beneficiaries; hence, they had standing to seek Respondents' removal as co-trustees. In essence, Petitioners' position is that the language added to the trust instrument by the trial court served merely to reduce Petitioners' share, not eliminate them as beneficiaries.

Contrarily, Respondents contend that Julia's trust instrument as amended contains an ambiguity, latent in nature. It is often said that there are two types of latent ambiguities:

> "One type explicitly describes a person or thing, and two or more persons or things fit exactly the description or condition ... [, and] [t]he other type exists when no person or thing fits the description or condition ..., but two or more persons or things do fit the description or condition, in part, and imperfectly."

*Breckner,* 600 S.W.2d at 55[2].

Here, Respondents seem to be contending that the former type of latent ambiguity exists. They assert that "[t]he latent ambiguity in Julia's trust is whether descendants of Julia's 'children' has reference solely to the three children she identified in her Will, or has reference to a dictionary or statutory meaning." In developing that argument, Respondents rely on the oft-stated principle that a will and trust must be construed together when they form part of the same estate plan. *Commerce Trust Company v. Starling,* 393 S.W.2d 489, 494[6] (Mo.1965); *Schupbach,* 760 S.W.2d at 924[9]. Applying that rule, they point to the will phrase, "I have three (3) children, namely ... PEGGY ..., FRANKIE ... and MARILYNN ..." and also the fact that in her will, Julia made no mention of her deceased children or their

descendants. From that, Respondents argue that one can readily ascertain that Julia intended to define "children" as Peggy, Frankie, and Marilynn. Continuing, Respondents assert that if that definition of "children," i.e., Peggy, Frankie, and Marilynn, was what Julia intended when she referred to "Grantor's children" in paragraph "C" of the trust, it is then impossible to ascertain, with any degree of certainty, what her intent was regarding beneficiaries. Consequently, they argue that a latent ambiguity exists which needed extrinsic evidence to resolve. We disagree.

 Missouri courts generally use the same rules for construing both trusts and wills. *Buder v. United States,* 7 F.3d 1382, 1385[3] (8th Cir.1993) (citing *Central Trust Bank v. Stout,* 579 S.W.2d 825, 827[2] (Mo. App.1979)). When, as here, the trust and will form parts of the same plan, the documents must be construed together. *Commerce Trust,* 393 S.W.2d at 494[6]. The paramount rule of construction in determining the meaning of such instruments is that the grantor/testator's intent is controlling. *Hollis v. Estate of Hollis,* 845 S.W.2d 156, 158 (Mo.App.1993); *Hall,* 810 S.W.2d at 713–14[1]. This intent must be gathered from the whole of both documents and not single words, passages, or sentences. *Hollis,* 845 S.W.2d at 158[4]. In ascertaining this intent, courts must give the words used in the will and trust their usual, ordinary and natural meaning unless there is something in the instruments to deflect from that meaning. *See Commerce Trust,* 393 S.W.2d at 494[3]. We must construe the instruments to avoid, if possible, repugnancy in their various provisions. *Id.*

 Whether an ambiguity exists in Julia's estate documents is a question of law and we are free to make our own determination as to the meaning of Julia's will and trust. *In re Estate of Beare,* 880 S.W.2d 562, 565[1] (Mo.App.1993); *Boatmen's Trust Company v. Sugden,* 827 S.W.2d 249, 254[9] (Mo.App.1992). We review declarations of law *de novo. Beare,* 880 S.W.2d at 565[2].

When we construe the language and provisions of Julia's will and reformed trust according to the above rules, and in light of the attending circumstances, we find no ambiguity. The declaration by Julia in her will that, "I have three (3) children," is in the present tense. When such words are given their usual, natural, and ordinary meaning as understood by a reasonable person, they simply express the fact that Julia had three living children when she executed her estate plan documents. Under the circumstances, the absence from Julia's will of any mention of her deceased children is not something that deflects from the usual, ordinary, and natural meaning of the words "Grantor's children" in her reformed trust as meaning all her children, living or dead. We reject Respondents' argument to the contrary.

Moreover, Julia disposed of her personal possessions via her will and all her other estate by her trust. We are not persuaded that Julia intended to attach a special and restrictive definitional meaning to "children" based on the fact that she gave her personal possessions to her three living children in her will. Julia's bequest to her three living children of her personal possessions does not depart from the meaning we have ascribed to "Grantor's children" in construing the trust. We find no latent ambiguity in the reformed trust instrument.

It is elementary that "[a] trust can be created in favor of the members of a class of persons where the class is definite enough so that its membership can be ascertained." II AUSTIN W. SCOTT AND WILLIAM F. FRATCHER, SCOTT ON TRUSTS § 120, at 197 (4th ed. 1987). *See also Adams v. Simpson,* 358 Mo. 168, 213 S.W.2d 908, 912[5] (1948) (holding that persons within class of beneficiaries designated in will are deemed to have been intentionally included by testator).

 Here, Julia's trust document, both before and after reformation, created a trust for a class described as "descendants, collectively, of each of the Grantor's children who [were] . . . deceased" when Julia died. That was a class "definite enough so that its membership [could] be ascertained." When Julia created the trust, Petitioners were its only members since two of Julia's children were then deceased: Eddie, who died without issue, and Charles Jr., Petitioners' father. As

no other of Julia's children died after the trust was created, Petitioners were ultimately the only members of the class. Julia's trust, both before and after reformation, unambiguously identified Petitioners as beneficiaries.

 In finding that Petitioners were not beneficiaries under the reformed trust, the trial court relied upon testimony of Julia's declarations about her intent made before, at the time of, and subsequent to the execution of her estate documents. By relying on this type of extrinsic evidence, the trial court gave no effect to the clause in Julia's will that "provide[d] for one equal share for the descendants, collectively, of each of the Grantor's children who may then be deceased, which shares shall be divided per stirpes and not per capita." In both respects, the trial court erred. Extrinsic evidence of a grantor's statements of intent is only admissible to resolve a latent ambiguity. *Schupbach,* 760 S.W.2d at 923[6]. We have found no latent ambiguity within the trust instrument. Thus, there is no support for the trial court's use of evidence from beyond the four corners of the trust instrument to construe its meaning.

In *Boatmen's,* 640 S.W.2d at 502, we explained why parol evidence of a grantor's declarations of intent may not be used to contradict the express terms of an instrument:

"Parol evidence concerning a testator's or grantor's declarations concerning his intention, whether made before, during or after execution of will or trust, is incompetent upon the question of construction to be given to the language used in the instrument. The reason for this is that the intention is to be gleaned from the instrument itself and considered in the light of the extrinsic circumstance where the language is ambiguous. If parol evidence of oral declarations by a testator or grantor was admitted, not only would the result be to subject the question of his intention to evidence of declarations which he, being dead, could not refute, but it would also in

effect violate the statutes requiring wills and trusts to be made in writing." *Id.*

 The well-established general rule that parol evidence cannot be used to vary or contradict the terms of an unambiguous document is a rule of law and not of evidence. *Central Production Credit Ass'n v. Reed,* 805 S.W.2d 300, 302[6] (Mo.App.1991). Evidence offered in violation of such rule must be ignored, even if the parol evidence has been received without objection. *Glass v. Mancuso,* 444 S.W.2d 467, 475[1] (Mo.1969).

Based on our conclusion that the trust instrument as reformed was free of ambiguity, it follows that the parol testimony concerning Julia's declarations about her intent was improperly received and should have been ignored by the trial court. *See Glass,* 444 S.W.2d at 475. Under the circumstances, the decision about whether Petitioners are beneficiaries of the trust must be based solely on the language of the reformed trust. *See Central Production,* 805 S.W.2d at 302. Effect must be given to the clause, present in both the executed and reformed trust, which "provide[d] for one equal share for the descendants, collectively, of each of the Grantor's children who may then be deceased, which shares shall be divided per stirpes and not per capita." Since Petitioners are, in fact, within this class of beneficiaries, the trial court could not, as a matter of law, have found that they are not beneficiaries under the trust and that they lack standing to request removal of the co-trustees. We find that they are beneficiaries under the trust as reformed by the trial court; consequently, they have standing to request removal of the co-trustees.

In their fifth point, Petitioners contend that the trial court erred when it dismissed petition "A" in which they sought an order removing Respondents as co-personal representatives of Julia's probate estate. Of the various positions taken by Petitioners on this point, the following has merit.

 Section 473.140, RSMo 1994, provides for the removal of a personal representative by either "the court, upon its own motion, or upon complaint in writing made by any *person interested* supported by affidavit...." *Id.* (emphasis ours). Under the

probate code,[5] the term " '[i]nterested persons' mean[s] heirs, ... or any others having a property right or claim against the estate of a decedent being administered...." § 472.010(15). At the very least, and curiously, among the trial court's findings, Petitioners are heirs of the testator, Julia E. Lehr. This status qualifies them as having standing as "interested persons" to request the removal of Respondents as co-personal representatives under § 473.140. The trial court erred when it sustained Respondents' motion to dismiss petition "A" on the grounds that Petitioners were not devisees or legatees under Julia's will and therefore lacked standing.

We affirm that part of the judgment that reformed Julia's trust. We reverse that part of the judgment that dismissed petitions "A" and "B" based on the finding that Petitioners lacked standing. As the trial court never reached the merits of petitions "A" and "B," we remand for further proceedings.[6]

PREWITT, P.J., and CROW, J., concur.

---

5. As defined by § 472.010(5), RSMo 1994, " '[c]ode' or 'probate code' means chapters 472, 473, 474 and 475, RSMo[.]"

6. Because we find Petitioners' contentions in Points IV and V have merit, there is no need to address their Points I, VI and VII.