Julia Amma **BARNES**, Respondent,

v.

John Harris **MARSHALL** et al., Appellants,

Ward E. Barnes et al., Defendants.

No. 55205.

Supreme Court of Missouri,
Division No. 1.

May 10, 1971.

Joslyn & Joslyn, L. D. Joslyn, Charleston, for respondent.

Banta & Banta, Charleston, for appellants.

HOLMAN, Judge.

This action was filed to contest a will and two codicils executed by Dr. A. H. Marshall a short time before his death which occurred on July 29, 1968. The plaintiff is a daughter of the testator. The defendants are the beneficiaries of the alleged

will. A number are relatives of testator, but many are religious, charitable, and fraternal organizations. A trial resulted in a verdict that the paper writings were not the last will and codicils of Dr. Marshall. A number of the defendants have appealed. We will hereinafter refer to the appellants as defendants. We have appellate jurisdiction because the will devises real estate and also because of the amount in dispute.

One of the "Points Relied On" by defendants is that the verdict is against the greater weight of the credible evidence. Since this court will not weigh the evidence in a case of this nature this point, strictly speaking, would not present anything for review. However, in considering the argument under that point we have concluded that defendants actually intended to present the contention that plaintiff did not make a submissible case and that the trial court erred in not directing a verdict for defendants, and we will so consider the point. The petition charged that testator was not of sound mind and did not have the mental capacity to make a will. The transcript contains more than 1,100 pages and there are a large number of exhibits. We will state the facts as briefly as possible and we think they will clearly support our conclusion that the submission is amply supported by the evidence.

The will, executed April 30, 1968, made specific bequests of testator's home and office furniture and equipment. The remainder of the net estate was devised to trustees, with annual payments to be made from the income to various individuals, churches, charities, and fraternal organizations. Plaintiff, her husband and two children were to receive $5.00 each per year. The estate was appraised in the inventory at $525,400.

The Marshalls had three children: plaintiff who lived in St. Louis, Mary Taylor Myers who lived in Dexter, Missouri, and died in May 1965, and Anetta Ester Vogel who lived near Chicago and who died about a month after her father's death.

In stating the evidence offered by plaintiff we will deal specifically with five witnesses: three lay witnesses because of contentions concerning their testimony, hereinafter discussed, and the two medical witnesses because of the importance we attribute to their testimony. There were many other witnesses whose testimony we will endeavor to summarize in a general way.

Ward Barnes, husband of plaintiff, testified that he visited in the Marshall home frequently from the time of his marriage in 1930 until Dr. Marshall's death; that Mrs. Marshall was a very cultured, refined, patient, and accommodating woman; that he spent a great deal of time with testator and soon learned that testator would dominate the conversation in accordance with a certain pattern; that testator told him that he discontinued his medical practice at the command of the Lord so that he might use his time in saving the nation and the world; that testator had told him "that the Lord had revealed to him the secrets of heaven; that he was the only man on earth to whom the Lord had revealed these secrets; that he had told him that heaven was a glorious place and that when he went to heaven he would have a beautiful crown and a wonderful throne sitting next to Thee Lord. He said that there were three powers in heaven, the Lord, Thee Lord, and God, and he said that this throne that he would have would be on the right hand side of Thee Lord in heaven. He said that heaven was a wonderful place, Thee Lord had revealed to him that whatever pleasures man had on earth he would have in heaven. If it was whiskey, if it was gambling, if it was women, that these would be provided him." He stated that testator had also told him that the Lord had given him a special power of calling upon the Lord to right the wrongs which people had done to him; that many times he related instances of various people whom he had "turned over to the Lord" and the Lord had meted out justice at his instance by taking away the person's wealth, and usually that the person lost his health, had a long period of suffer-

ing, and eventually died; that when testator related stories about the men he had turned over to the Lord he would become highly emotional, would pound on the table with his fists, would call these men dirty profane names, his face would become flushed, and the veins in his neck would stand out; that testator had told him that he (testator) had run for Congress on two occasions and had run for President of the United States (although apparently never nominated by any party) on two or three occasions; that he had told him that "if he were made President of the United States he would cancel all public debt, that he would call in all government bonds and discontinue the interest on all of these obligations, and that he would then print money and control the currency, and that he would kill the damn bankers and the crooks and the thieves that were robbing the people in political office and that the world would then be able to settle down and live in peace." He stated that on one occasion testator took him to his office and showed him a number of young women who were mailing out material in the interest of his candidacy; that he had said it was costing him "thousands of dollars to mail this material out, but the Lord had told him to do it and he had no right to go counter to what the Lord had told him to do." He further stated that in one of his campaigns for President testator had purchased a new car and had many biblical quotations and sayings of his own printed all over the automobile; that he had observed him, campaigning from this car, at the corner of Grand and Lindell Boulevard in St. Louis.

Witness Barnes further testified that testator had told him that Mrs. Marshall had inherited a piece of land and that when it was sold he took part of the money and gave her a note for $3,500; that later Mrs. Marshall had pressed him for payment and had conferred with Moore Haw, an attorney, and that because of that testator had locked her out of the house; that Mrs. Marshall then filed a suit and caused him to pay her the $3,500; that eventually the

Marshalls were reconciled and resumed their life together; that at the time Mrs. Marshall died he and plaintiff went immediately to Charleston and at testator's request plaintiff made the funeral arrangements; that testator went to his wife's bedroom and searched the room looking for money and called him and plaintiff in to help him; that he found only a few dollars and then became enraged, "his fists clenched * * * his hands were shaking, his body was trembling; his face was red and he was—you could see he was in a terrible emotional state as he stood there shaking his fists and shouting. He said, 'I know she had more money than that. * * * Your mother made me pay and that scoundrel Moore Haw, the dirty, low down * * * made me pay that thirty-five hundred dollars,' and he said, 'I want my money back. I want you to give it to me.'" Witness further testified that of the $3,500 testator had paid his wife in 1941 Mrs. Marshall had given plaintiff $1,500; that from the time of his wife's death until his own death testator had frequently demanded that plaintiff send him $3,500 and stated that if she didn't he would cut her out of his will; that it was his opinion that from the time he first became acquainted with him until his death Dr. Marshall was not of sound mind.

Frank Eaves testified that he had known testator for about eight years before his death; that he was Plant Supervisor for Crenshaw Packing Company and that testator would come to the plant about once a week; that he had heard testator talk about having the Lord come down on people, making them suffer, and having them killed; that he said his furnace didn't work and he had the Lord put a curse on it and it had worked good ever since; that he said he "talked directly to God and God told him things"; that when he would discuss subjects of that kind "his face would get real red, his eyes would bug out, the vessels would stand out on his neck, he would slobber and shout, and pound on anything available"; that he would sometimes come in dressed in nothing but his

nightgown and his house shoes; that on one occasion he came to the plant with nothing on but a housecoat; that he was talking about a rash on his body and opened his housecoat and exposed his private parts to the female secretary and others present. Mr. Eaves was of the opinion that testator was of unsound mind over the period he had known him.

William West testified that he was a drug clerk in the Myers Drug Store in Dexter; that he had known testator from 1951 until his death; that testator came in the drug store about once a month during that period; that he had heard testator say that he talked directly to the Lord and the Lord told him the things he was to do; that one of these was that he should save the world and should be prime minister of the United States; that he also talked about turning people over to the Lord for punishment and when he did so the Lord would mete out the punishment and the men would die, or lose their wealth or something of that nature; that when he would talk about such things he used loud abusive language, his face would be flushed, and he would pound the table; that at the funeral of testator's daughter, Mrs. Myers, he (the witness) started to assist Mrs. Marshall, who was then about 80 years old, out of her chair and Dr. Marshall "slapped me on the arm and told me to keep my hands off of her"; that he was present when Mrs. Marshall was trying to get out of the car and in so doing exposed a portion of her leg and testator "bawled her out for it." Witness was of the opinion that testator, during the time he had known him, was of unsound mind.

Dr. Charles Rolwing testified that he first saw testator professionally in 1940; that at that time testator complained of heart trouble but he was unable to find any evidence of such; that he was of the opinion that he was then suffering from manic-depressive psychosis for which there is no cure and that it would gradually get worse; that he also attended testator from the first part of May 1968 until his death in July;

that at that time he was suffering from a serious heart ailment; that he was at that time still suffering from manic-depressive psychosis; that he was of the opinion that on April 30, May 17, and May 24, 1968, testator was of unsound mind.

Plaintiff also presented the testimony of Dr. Paul Hartman, a specialist in psychiatry and neurology, who testified in response to a hypothetical question. This question hypothesized much of the evidence related by the other witnesses for plaintiff and utilizes ten pages of the transcript. In response thereto Dr. Hartman expressed the opinion that Dr. Marshall was of unsound mind on the dates he executed his will and codicils; that he would classify Dr. Marshall's mental disease as manic-depressive psychosis with paranoid tendencies; that it was his opinion that Dr. Marshall was incapable of generalized logical thinking.

In addition to the foregoing evidence plaintiff testified herself and offered more than a dozen other witnesses, all of whom related unusual conduct and statements of testator. Plaintiff also offered a large number of exhibits in the nature of letters from testator and various publications containing advertisements and statements written by testator. There was evidence that plaintiff had been a dutiful daughter, had been solicitous of testator and her mother, had visited them frequently and often would take prepared food which she knew they liked. A number of these witnesses testified that testator had told them of various men who had wronged him and that he had turned them over to the Lord who meted out punishment in the form of financial loss, illness, death, or all three; that when he would tell of these things he would speak loud, get excited, his face would become red, his eyes bulge out, and he would gesture violently; that testator was unreasonably jealous of his wife and often said that all women who wore short skirts, or smoked, were immoral.

There was testimony that on the Christmas before the death of his daughter, Mary Myers, the Myers and Barnes families ate

Christmas dinner with the Marshalls, and after the dinner testator "jumped on" Mary about her skirt being short and continued doing so until Mary became so upset that she and her husband had to leave.

A number of witnesses testified concerning the fact that testator would go to various public establishments dressed in his nightgown and bathrobe. An article written by testator and published in a local newspaper under date of June 4, 1942, under the heading of "DR. MARSHALL SAYS," contained the following: "Providence they say always raises up a great leader in every crisis * * *. I am that great leader. I am that prophet that Moses and all the other prophets have spoken about. I am the Messiah that the people of this world have been talking and praying about and believing and hoping that he would soon show up. I am the inspired prophet."

In contending that plaintiff did not make a submissible case defendants point to the testimony of their witnesses to the effect that testator was of sound mind and was calm, quiet, and collected on the day the will was executed. The difficulty with that argument is that in determining this question "we must disregard the evidence offered by defendants unless it aids plaintiffs' case, accept plaintiffs' evidence as true, and give them the benefit of every inference which may legitimately be drawn from it." Sturm v. Routh, Mo.Sup., 373 S.W.2d 922, 923.

It is also contended that most of plaintiff's evidence dealt with testator's "sickness, peculiarities, eccentricities, miserliness, neglect of person or clothing, forgetfulness, anger, high temper, unusual or peculiar political and religious views, jealousy, mistreatment of family, unusual moral views, and repeating of stories, which are not evidence of testamentary incapacity or of unsound mind."

As we have indicated, we do not agree with defendants' contentions. We have stated a portion of the evidence and it need not be repeated here. It is sufficient to say that we think testator's stated views on government, religion, morals, and finances go beyond the classification of peculiarities and eccentricities and are sufficient evidence from which a jury could reasonably find he was of unsound mind. When we add the strong medical testimony to that of the lay witnesses there would seem to be no doubt that a submissible case was made.

■ Defendants also point out that there is evidence that a person suffering from manic-depressive psychosis has periods of normalcy between the abnormal periods of elation or depression and that testator was in a normal period at the time the will was executed. The mental condition of testator at the precise time the will was executed was a question for the jury to decide. The jury was obviously persuaded that he was not of sound mind and since there was evidence to support that verdict it is conclusive.

The defendants have briefed the contention that the trial court erred in sustaining objections to certain questions they desired to ask the prospective jurors on voir dire. After the court had sustained objections to certain questions the defendants made an offer, out of the hearing of the veniremen, to ask the following series of questions (which offer the court denied): "One of the issues in this case will be whether Dr. A. H. Marshall at the time he executed the will in question was of sound and disposing mind and memory. If the Court instructs you that the phrase 'sound and disposing mind and memory' means that a person was able when he signed his will to understand the ordinary affairs of life, the value and extent of his property, the persons who were the natural objects of his bounty, and that he was able to intelligently weigh and appreciate his natural obligation to them, will you follow such an instruction? * * * If the prospective juror answers 'no,' that he would not follow such an instruction, I would ask that the juror be excused. If his answer is

'yes,' then I would like to ask him the following question: Do you believe that a single and unmarried person of sound and disposing mind and memory, as you will be instructed by the Court, should be able to dispose of his property in any way that he wishes or that he sees fit. * * * If the answer by the prospective juror is 'no,' I would like to ask that he be excused. If his answer is 'yes,' then I would wish to ask him the following question: Do you still say 'yes' to the foregoing question even though this person, having three children and an estate of well over a half-a-million dollars, giving one of his children only five dollars per year? * * * If the answer is 'no' I would ask that the juror be excused. If his answer is 'yes,' then I would ask that I be privileged to ask this question: Do you still say 'yes' to my preceding question even though this person gives the greater part of his estate to religious and charitable institutions? * * * If the answer is 'no' I would ask that the juror be excused. If he should answer 'yes,' then I would wish to ask the following question: Do you still say 'yes' to my question, even though you may feel and believe that the terms of this person's will may be grossly unfair to one of his daughters and to her children?"

■■ It is fundamental in our jury system that litigants are entitled to unbiased and unprejudiced jurors. And in order to obtain such they should be allowed a reasonable latitude in examining prospective jurors on voir dire. However, "counsel has no right on voir dire to cause the prospective jurors to pledge or speculate as to their action in certain contingencies which may later occur or arise during trial. State v. Pinkston, supra [336 Mo. 614, 79 S.W.2d 1046]; State v. Ramsey, 355 Mo. 720, 197 S.W.2d 949. The qualified and selected and instructed juror, having been attentive to the argument of counsel and to the reasoning of his fellows, should be free to reach a conclusion satisfactory to him upon the evidence introduced." State v. Heickert, Mo.Sup., 217 S.W.2d 561, 562.

And, of necessity, a trial judge is vested with a broad discretion in controlling the voir dire examination and his rulings should not be disturbed unless they clearly and manifestly indicate an abuse of such discretion. Cleghorn v. Terminal Railroad Ass'n of St. Louis, Mo.Sup., 289 S.W.2d 13 [16].

The questions counsel sought to propound in this case were of a type which would tend to commit the veniremen. However, in any event, we cannot see how the rulings of the trial court could be considered prejudicial because counsel thereafter was permitted, without objection, to ask very similar questions of various prospective jurors, of which the following is an example:

"Mr. Banta: Mrs. Britt, the Court will instruct you as to the law and the issues in this case. Will you follow the law, the Court's instructions, even though you may think his instructions are wrong? Mrs. Britt: Yes, sir. Mr. Banta: You will follow the Court's instructions, even though they might disagree with what you think the law should be? Mrs. Britt: Yes, sir, I believe I can follow those instructions. * * *

"Mr. Banta: Do you believe that a person, subject to the conditions and restrictions as will be given to you in the Court's instructions, should have a right to make a will as they see fit? Mr. Burkett: If he is of sound mind, yes, sir. Mr. Banta: And irrespective of how he disposes of his property, you think that is his right to do that as he sees fit? Mr. Burkett: I think so. Mr. Banta: Even though he doesn't give his children anything? Mr. Burkett: Yes, sir. * * *

"Mr. Banta: Do you believe, subject to the instructions as will be given to you by the Court as to the law, that a person has the right to make a will as they see fit? Mr. Sutton: Yes, sir. Mr. Banta: Even though they might give one of their children only five dollars, do you still believe that? Mr. Sutton: Yes, sir. * * *

Mr. Banta: You wouldn't have any feeling that you would have to find for his daughter because he didn't leave her something in the will? Mr. Reeves: If that is his wish. * * * "

■ Under the circumstances here shown we rule that the trial court did not abuse its discretion in rulings relating to the voir dire examination and that no prejudicial error occurred in that regard.

■■ Plaintiff's evidence relating to the mental condition of testator encompassed the period from 1940 until his death in 1968. The next point briefed by defendants is that the court erred in admitting evidence of occurrences years prior to the execution of the will because it was too remote to have any probative value. It is true, as defendants contend, that "[e]vidence, not too remote, of mental unsoundness either before or after the will's execution is admissible, provided it indicates that such unsoundness existed at the time the will was made." Rothwell v. Love, Mo.Sup., 241 S.W.2d 893, 895. There can be no question, however, but that evidence concerning testator's mental condition long prior to the execution of the will is admissible if it tends to show his condition at the time of said execution. Holton v. Cochran, 208 Mo. 314, 106 S.W. 1035, l. c. 1069; Buford v. Gruber, 223 Mo. 231, 122 S.W. 717 [4]; Clingenpeel v. Citizens' Trust Co., Mo.Sup., 240 S.W. 177. Dr. Rolwing testified that he treated testator in 1940 and that he was of unsound mind at that time; that he was suffering from manic-depressive psychosis, an incurable mental disease which would gradually get worse. That testimony was certainly admissible as it would have a direct bearing on testator's mental condition at the time the will was executed. And in view of that testimony it was appropriate to admit other evidence concerning testator's statements and conduct tending to support the submission of mental incapacity occurring during the intervening period. This point is accordingly ruled adversely to defendants' contention.

■ The next point briefed by defendants is that the court erred in permitting lay witnesses Ward Barnes, Frank Eaves, and William L. West to express an opinion that testator was of unsound mind. This for the reason that the facts related by those witnesses were not inconsistent with sanity and hence the necessary foundation was not established. The rule regarding the competency of lay witnesses to express an opinion on the issue as to whether a person is or is not of sound mind is that "a lay witness is not competent to testify that, in the opinion of such witness, a person is of unsound mind or insane, without first relating the facts upon which such opinion is based; and, when the facts have been stated by such lay witness, unless such facts are inconsistent with such person's sanity, the opinion of such lay witness that the person under consideration was insane or of unsound mind, is not admissible in evidence and may not be received. * * * In this connection it has repeatedly been determined that evidence of sickness, old age, peculiarities, eccentricities in dress or oddities of habit, forgetfulness, inability to recognize friends, feebleness resulting from illness, and other facts or circumstances not inconsistent with the ability to understand the ordinary affairs of life, comprehend the nature and extent of one's property and the natural objects of his bounty, and which are not inconsistent with sanity, cannot be used as a basis for the opinion testimony of a lay witness that a person is of unsound mind or insane. * * * 'The rule is well settled that, ordinarily, before a lay witness will be permitted to give his opinion that a person is of unsound mind, he must first detail the facts upon which he bases such opinion, but if he expresses an opinion that such person is of sound mind, he is not required to detail the facts upon which he founds his opinion. The reason for the rule is obvious. An opinion that a person is of unsound mind is based upon abnormal or unnatural acts and conduct of such person, while an opinion of soundness of mind is founded upon the absence of such acts

and conduct.'" Lee v. Ullery, 346 Mo. 236, 140 S.W.2d 5, l. c. 9, 10.

Because of this point we have heretofore detailed the testimony of these three witnesses in the factual statement and such need not be repeated here. We think it is obvious that each witness detailed sufficient facts upon which to base the opinion stated. Those facts went far beyond a mere showing of peculiarities and eccentricities. They were clearly inconsistent with the conclusion that testator was of sound mind. The facts detailed by these witnesses are quite different from those stated by the witnesses in Lewis v. McCullough, Mo.Sup., 413 S.W.2d 499, the case upon which defendants rely.

The defendants also contend that the court erred in refusing to permit their witness, Harris D. Rodgers, to express an opinion that testator was of sound mind. This witness operated an abstract business in Benton, Missouri, which is about 20 miles from Charleston. However, he had known testator for about 35 years and had seen and visited with him on an average of from two to four times a year. We have concluded that we need not determine whether or not the court erred in excluding this testimony. This for the reason that it is "well settled that, if in a specific instance the evidence should not have been excluded, the error is harmless if the same evidence is found in the testimony of the same or other witnesses, given before or after the objection was sustained." Steffen v. Southwestern Bell Telephone Co., 331 Mo. 574, 56 S.W.2d 47, 48. In this instance defendants offered ten lay witnesses who were permitted to testify that in their opinion testator was of sound mind. With such an abundance of testimony on that issue it seems apparent to us that the exclusion of the opinion of one additional witness could not have been prejudicial. No reversible error appearing this point is ruled adversely to defendants.

Defendants' final contention is that the court erred in refusing to give their proffered Instruction No. P–1. They say that the instructions given were not sufficient to properly instruct the jury and that P–1 was necessary to clarify the issues. The instructions given submitted the issue as to whether testator was of sound and disposing mind and memory at the time he signed the documents. Also given was Instruction No. 8 which is MAI 15.01 and which defines the phrase "sound and disposing mind and memory."

Instruction P–1 reads as follows:

"The Court instructs the jury that, in determining the issue of whether Dr. A. H. Marshall was of sound and disposing mind and memory, you may take into consideration the instrument itself and all its provisions, in connection with all other facts and circumstances in evidence. But, under the law of the State of Missouri, Dr. A. H. Marshall was not obligated to leave any part of his estate to the plaintiff, Julia Amma Barnes, and he was not obliged to mention plaintiff in his will. A man who is of sound and disposing mind and memory as defined by Instruction No. —— has the right to dispose of his property by will as he may choose, even to the entire exclusion of those who, but for the will, would be the heirs of his estate; and if after considering all the evidence in the case, including the instrument itself and all its provisions, you believe that Dr. A. H. Marshall was of sound and disposing mind and memory, you will not further consider whether said disposition was appropriate or unappropriate. The jury should not substitute its judgment for the testator's judgment, nor should they determine the case upon the wisdom or the justice of the disposition made by the testator of his property; whether such disposition is just or right is a question for the testator, and for none other than the testator."

It will be noted that P–1 is clearly a cautionary instruction. And the rule is well established that "[t]he giving

of cautionary instructions is largely within the discretion of the trial court and unless such discretion is abused it will not be interfered with on appeal." Bucks v. Hamill, 358 Mo. 617, 216 S.W.2d 423, 425. We also have the view that the instruction is somewhat argumentative in its nature. In that connection this court recently said that "Missouri Approved Instructions were adopted so that questions of fact may be accurately and concisely submitted to a jury in lieu of the vast amount of surplusage that formerly was found in many instructions." Stemme v. Siedhoff, Mo.Sup., 427 S.W.2d 461, 466. Moreover, it appears that the manner in which P–1 is prepared is out of harmony with the direction that "instructions shall be simple, brief, impartial, free from argument * * *." S.Ct. Rule 70.01(e), V.A.M.R. The ultimate issues were properly submitted to the jury and we do not consider it necessary or desirable that P–1 should have been given. The trial court did not abuse its discretion in refusing to give it and hence no reversible error occurred.

The judgment is affirmed.

All concur.